THE STATE OF DELAWARE, upon the relation of ALFRED R. MILLER, *v.* LOFT, INCORPORATED, a corporation of the State of Delaware.

*(June* 23, 1931.)

PENNEWILL, C. J., RICE and HARRINGTON, J. J., sitting.

*Richard P. Tippett* (of the Maryland Bar) and *Ayres J. Stock-ley* (of Hastings, Stockley and Morris) for petitioner.

*Robert H. Richards, Clarence A. Southerland, Charles C. Keedy, George N. Davis* (of Wilmington), and *Arthur F. Driscoll* (of the New York City Bar), for respondent.

Superior Court for New Castle County.

No. 296, September Term, 1930.

HARRINGTON, J., delivering the opinion of the court:

The petition of the relator, among other things, alleged that he owned more than four hundred (400) shares of the capital stock of the respondent corporation; that he had requested permission to examine its books, records and correspondence, but that such request had been refused.

It, also, alleged that his desire to examine such books, records and correspondence was for no sinister or ulterior motive.

In this connection, the petition further alleged that the relator desired to inspect such books and records:

1. For the purpose of determining the actual value of his stock in the respondent corporation.

2.  For the purpose of acquainting himself with the transactions with reference to the purchase by the respondent corporation of shares of stock of the Happiness Candy Company.

3.  For the purpose of acquainting himself with the expenditures made by that corporation since May 1, 1930.

4.  For the purpose of determining what outstanding loan or loans had been made by that corporation since May 1, 1930.

The respondent contends, however:

1.  That the relator has no right to inspect the books and records of the Loft Company because under the provisions of section 10 of its Charter and of section 11 of its By-Laws, that right depends entirely upon whether inspection is authorized by the board of directors of the corporation; and that no such permission was given in this case.

2.  That the application of the relator is not for any proper purpose due to his financial interest in the corporation, but solely because of ill feeling toward the Guth management.

3.  That its stock is not only listed on the New York Stock Exchange and that information as to its market value can, therefore, be readily ascertained from that source, but that the relator has, also, been furnished from time to time with financial statements showing the condition of the corporation from which the book value of its stock is a mere matter of mathematical calculation.

4.  That all of the material information that could possibly be procured from the corporate books and records, with respect to the purchase of more than 71% of the stock of the Happiness Candy Company, has either appeared in the financial statements above referred to, or in other papers already sent the relator.

5.  That where a stockholder seeks to enforce his common-law right to inspect the corporate books and records he must not only plead and prove a proper purpose, but must, also, plead and prove "a reason or cause rendering an examination opportune and proper." In other words, it contends that it must appear from both pleading and proof that the stockholders' "interests or rights are likely to be seriously prejudiced and affected if the remedy (the right to inspect the corporate books) is not given" and that "it is necessary for him

to have the information (sought) in order to properly protect his interests in the corporation."

■ At common law the writ of mandamus was not a writ of right, but would issue only when the facts, in the exercise of a sound judicial discretion, justified it. This rule has been repeatedly recognized in this State (*State ex rel. Theile v. Cities Service Co.,* 1 *W. W. Harr.* [31 *Del.*] 514, 115 *A.* 773, 22 *A. L. R.* 8; *State ex rel. Brumley v. J. & M. Paper Co.,* 1 *Boyce* 379, 77 *A.* 16, 30 *L. R. A.* [*N. S.*] 290; *McCoy v. State,* 2 *Marv.* 544, 36 *A.* 81; *State v. Penn-Beaver Oil Co.,* 4 *W. W. Harr.* [34 *Del.*] 81, 143 *A.* 257; *State ex rel. Linihan v. United Brokerage Co.,* 6 *Boyce* 570, 101 *A.* 433), and has not been in any wise changed by *chapter* 213, *vol.* 34, *Laws of Delaware.*

■ The stockholders of a corporation are the equitable owners of its assets and in an application to inspect its books their rights and interests must be considered, but in order for the writ to issue, its purpose must be a proper one and not adverse to the interests of the corporation.

The right of the stockholder in this respect is, therefore, in no sense an absolute right, but merely a qualified right depending upon the facts of the particular case.

■ Where the motive or purpose of the examination is mere curiosity or where it is sought to be made for some indefinite, doubtful, uncertain, or mere vexatious purpose, or where it has no relation to the relator's interest, as a stockholder, in the corporation, it would not be a proper purpose within this rule. *State ex rel. Brumley v. J. & M. Paper Co.,* 1 *Boyce* 379, 392, 77 *A.* 16, 30 *L. R. A.* (*N. S.*) 290. See, also, *State ex rel. Cochran v. Penn-Beaver Oil Co.,* 4 *W. W. Harr.* (34 *Del.*) 81, 143 *A.* 257; *State ex rel. Linihan v. United Brokerage Co.,* 6 *Boyce* 570, 101 *A.* 433; *State ex rel. National Bank of Del. v. J. & M. Paper Co.,* 4 *Boyce* 248, 88 *A.* 449; *State ex rel. De Julvecourt v. Pan American Co.,* 5 *Penn.* 391, 61 *A.* 398, 63 *A.* 1118; *State ex rel. Theile v. Cities Service Co.,* 1 *W. W. Harr.* (31 *Del.*) 514, 115 *A.* 773, 22 *A. L. R.* 8.

■ Further than that, as a general rule and unless there is something to indicate that such information was fraudulent or un-

reliable, there is no reason for the issuance of the writ where the stockholder has already been given all the information as to the corporate affairs that he is reasonably and fairly entitled to receive or that he could procure from an examination of the corporate books and records. *State ex rel. Cochran v. Penn-Beaver Oil Co.*, 4 *W. W. Harr.* (34 *Del.*) 81, 143 *A.* 257; *In re Wygant*, 101 *Misc. Rep.* 509, 167 *N. Y. S.* 369.

The respondent contends that even though the purpose of a stockholder, in desiring to examine the corporate books, is not an improper one, some particular exigency making the information sought necessary, for the protection of his interest as a stockholder, must also be both alleged and proved. In support of this contention it cites *Varney v. Baker*, 194 *Mass.* 239, 241, 80 *N. E.* 524, 10 *Ann. Cas.* 989; *Shea v. Parker*, 234 *Mass.* 592, 594, 126 *N. E.* 47; *Matter of Latimer v. Herzog Teleseme Co.*, 75 *App. Div.* 522, 78 *N. Y. S.* 314; *Mechem on Modern Law of Corporations, vol.* 2, *p.* 894, § 1097.

Even if the authorities cited by it support that contention such a rule would seem to be inconsistent with the principles laid down by our Supreme Court in *State ex rel. Brumley v. J. & M. Paper Co.*, 1 *Boyce* 379, 77 *A.* 16, 30 *L. R. A.* (*N. S.*) 290, *supra.*

True, the respondent also contends that in principle not only the *Brumley* case, 1 *Boyce* 379, 77 *A.* 16, 30 *L. R. A.* (*N. S.*) 290, *supra*, but, also, *State ex rel. De Julvecourt v. Pan American Co.*, 5 *Penn.* 391, 61 *A.* 398, 63 *A.* 1118; *State ex rel. National Bank of Del. v. J. & M. Paper Co.*, 4 *Boyce* 258, 88 *A.* 449; *State ex rel. Linihan v. United Brokerage Co.*, 6 *Boyce* 570, 101 *A.* 433; *State ex rel. Cochran v. Penn-Beaver Oil Co.*, 4 *W. W. Harr.* (34 *Del.*) 81, 143 *A.* 257, and *State ex rel. Rogers v. Sherman Oil Co.*, 1 *W. W. Harr.* (31 *Del.*) 570, 117 *A.* 122, are to the same effect as the other cases cited by him.

As we have already pointed out, however, the common-law right of the stockholder to examine the corporate books and records is merely a conditional right depending, in most cases, upon whether it is for a proper purpose. Because of that fact, such purpose must not only be proved, but must, also, be alleged not by a

mere bare general statement that it is a proper one, but by the allegation of specific facts, from which the propriety of such purpose will appear. *State ex rel. National Bank of Del. v. J. & M. Paper Co.,* 4 *Boyce* 248, 88 *A.* 449; *State v. Cities Service Co.,* 1 *W. W. Harr.* (31 *Del.*) 346, 114 *A.* 463; *State v. Cities Service Co.,* 1 *W. W. Harr.* (31 *Del.*) 514, 518, 115 *A.* 773, 22 *A. L. R.* 8. As we view it, the Delaware cases referred to by the respondent are merely examples of the application of this rule.

Whether the bare allegation that the relator desires to ascertain the value of his stock complies with this rule may be subject to some question even in view of the language used by the court in *State ex rel. Brumley v. J. & M. Paper Co.,* 1 *Boyce* 379, 77 *A.* 16, 30 *L. R. A.* (*N. S.*) 290.

In *State ex rel. Cochran v. Penn-Beaver Oil Co.,* 4 *W. W. Harr.* (34 *Del.*) 81, 143 *A.* 257, while the report of the case indicates that the petition alleged little more than that, an examination of the original petition discloses that other allegations as to the relator's purpose appeared. These allegations were in substance that he had purchased his stock because of certain representations of the president of the respondent corporation, which he then believed to be true, but which he later had reason to believe were untrue; that he could get no information as to the affairs of the corporation from any of its officers; that no annual or other financial reports were ever made to the stockholders, and that he desired to inspect the corporate books to ascertain whether the representations made at the time of the purchase of his stock were true and how the facts disclosed from such investigation would affect the value of such stock.

But whatever the rule might be, if this were a preliminary motion to dismiss the petition, or to strike out some of its allegations, the evidence has been heard, and the case will be decided on its merits.

Differing from the old mode of procedure in mandamus cases and pursuant to the provisions of *chapter* 213, *vol.* 34, *Laws of Delaware,* the evidence in this case was heard by the court.

While the answer of the respondent required proof on the part of the relator of his stock ownership, that was clearly proved.

The relator's request to inspect the corporate books, and the refusal of such request was also proved. He further proved that prior to May, 1930, he had been president of The Loft Company; that at that time he had been succeeded as president of that corporation by Mr. Guth, who had previously been its vice-president; that while he was president of the respondent corporation, Mr. Guth had suggested the purchase of The Happiness Candy Company by that corporation; that he had investigated the affairs of that company so far as he was able to do so, not only statistically, but also as to the value of its leases and real estate holdings, with the idea of purchasing it for the Loft Company; that he had concluded from such examination that the Happiness Company would be of no value to the Loft Company, but that over seventy-one per cent of its capital stock had nevertheless been purchased by that company, after Mr. Guth became its president.

Very little other evidence was produced by the relator in his case in chief. On cross-examination of Mr. Miller it also appeared, however, that while he was president of the respondent corporation he had caused two hundred thousand dollars ($200,000) to be lent by that corporation to Mr. Carey, the son-in-law of Mr. Guth, and the note of Carey endorsed by Guth for that amount, together with fifty thousand shares of stock of The Loft Company as collateral security therefor had been delivered to that corporation. In connection with this evidence, he not only stated that he wished to ascertain from the corporate books whether there had been any other loans made, but also whether this loan was carried on such books as a quick asset.

It further appeared on cross-examination that Mr. Miller was a stock broker, and that there was strong personal feeling between him and Mr. Guth, growing out of the election of the latter to succeed him as president of the respondent corporation. In that examination, Mr. Miller also stated that he owned thirty-six hundred shares of the Loft Company stock when this petition was filed, and

still owned thirty-five hundred of those shares, and that his financial interest in the corporation was, therefore, too great for him to be hostile to it, whatever his feeling toward Mr. Guth might be.

He further stated that the market price of his stock had so sharply declined since he purchased it that in case of sale, he would have to suffer a loss of more than one hundred and fifty thousand dollars, and that his desire to examine the books of the respondent corporation was to determine the value of such stock and whether to buy more or to sell the stock already owned by him.

In support of its defense, the respondent produced and the court admitted its Charter and By-Laws. It appeared from these that the provisions of section 6 of paragraph 10 of the Charter and of section 11 of the By-Laws were as quoted in its answer. It admits that section 11 of the By-Laws, if it stood alone, and without any similar charter provision would be unreasonable and void. *State ex rel. Brumley v. J. & M. Paper Co.*, 1 *Boyce* 379, 77 *A*. 16, 30 *L. R. A.* (*N. S.*) 290; *Swift v. State ex rel. Richardson*, 7 *Houst.* 338, 6 *A*. 856, 32 *A*. 143, 40 *Am. St. Rep.* 127. It contends, however, that a corporate charter composes a part of the contract between the corporation and its stockholders, and that the rights of the relator, in this case, are governed by section 6 of the Charter which prohibits any inspection of corporate books by a stockholder unless authorized by the board of directors. Notwithstanding this contention, it concedes that this court must necessarily be governed by *State ex rel. Cochran v. Penn-Beaver Oil Co.*, 4 *W. W. Harr.* (34 *Del.*) 81, 143 *A*. 257, in which the court in banc held that a similar charter provision was not binding on the stockholder, and that the question was merely raised in this court in order to preserve its rights in a higher court.

The respondent further showed that since Mr. Miller had been deposed as president of the corporation, no less than eleven suits relating to the affairs of the Loft Company, some of which were still pending, and for which either Miller or Guth was directly or indirectly responsible, had been docketed. It also produced evidence to show that Miller had made some statements which might

be construed to show hostility on his part toward the corporation. Though there is some conflict of evidence on that question, we are satisfied that the relator has fairly shown that his purpose in desiring to examine the books of the respondent corporation was a proper one, in the sense that it was not solely actuated by ill feeling toward Mr. Guth. That, however, does not settle the question before us.

The financial statements sent by the respondent to its stockholders after Mr. Guth became president of the corporation were four in number. The first showed the balance sheet as of April 30, 1930, and was apparently sent out June 7, 1930; the second showed the balance sheet as of June 30, 1930, and was apparently sent out July 28, 1930; the third showed the balance sheet as of December 31, 1930, and was apparently sent out February 24, 1931; and the fourth showed the balance sheet as of April 5, 1931, and was apparently sent out April 18, 1931.

The purchase of the Happiness Candy Company stock, and the reasons for such purchase, including the location of its fifty odd stores, was also announced in an advertisement in the pictorial part of the New York Times on Sunday, August 30, 1931, copies of which were sent to the stockholders of the Loft Company at the time. This purchase together with some of the advantages derived therefrom was also announced by Mr. Guth in the letter of February 24, 1931, attached to the financial statement of December 31, 1930. The purchase price of the Happiness Candy Company stock did not appear in the advertisement above referred to, but it appeared in the statement of December 31, 1930, that such purchase price was one million one hundred thousand dollars ($1,100,000). This also appeared in the subsequent statement of April 5, 1931. The book value of such stock likewise appeared in that statement.

That notes to the extent of two hundred and fifty-five thousand five hundred and thirty-eight dollars ($255,538) for the balance of the purchase price of such stock were due April 2, 1931, also appeared in the statement of December 31, 1930. The fact that this item was not included in the statement of April 5, 1931, would also seem to indicate that these notes were paid at maturity.

The same comment may be made as to the entry of $199,438.47 appearing in the statement of December 31, 1930, as due the Happiness Candy Company for the purchase of inventories, etc. It is, therefore, difficult to see what other information of any material value to the relator, whether for the purpose of ascertaining the value of his stock, or for some other purpose, could be procured from an examination of the Loft Company's books and records. That company claims that the great value of the Happiness Candy Company, to it, is the fact that its widely distributed stores have materially aided in selling the Loft candies. This seems to be borne out in some degree by earnings shown in the statements issued since the purchase of that stock. However that may be, if the desire of the relator is to ascertain the real estate value of the stores belonging to the Happiness Candy Company, we are unable to see how that information could be procured from the books of the Loft Company.

True, the relator also intimates that it is his belief that the purchase of this stock must have been induced by some personal benefit to some one connected with the corporation in the way of a commission or otherwise, but there is no evidence whatever to support any such contention.

As already indicated, the recent earnings of the respondent company would seem to indicate that the Happiness Company was of some value to it but, however that may be, a mere difference of opinion as to the propriety of such a purchase, whether justified or not, would not be a ground for inspecting the corporate books.

Under the circumstances, we do not feel that we are justified in directing an examination of the respondent's books and records in connection with the purchase of the stock of the Happiness Candy Company.

This disposes of what the relator concedes to be his main contention in the case.

The respondent corporation admits that it carried the Carey-Guth note of $200,000 on its books as a quick asset, and that it so appeared on the copies of the financial statements sent out by it.

It claims, however, that it was justified in doing this because this note was secured by the 50,000 shares of Loft Company stock deposited as collateral, and which, according to the evidence, at the time of the argument, was selling on the New York Stock Exchange for six dollars per share, and when this petition was filed, at about four and three-eighths dollars per share. In connection with his alleged desire to examine the corporate books for the purpose of ascertaining the value of his stock, the relator in reply to the respondent's argument that he had been given all of the information to which he was reasonably entitled, or could procure from its books, nevertheless, pointed out three things that he claimed were not clearly explained by the financial statements, copies of which had been sent by the Loft Company to its shareholders:

1. That while on January 1, 1930, the books of the corporation showed a surplus of $2,351,512.52, the statements showed that by April 5, 1931, it had been reduced to $1,327,388.34, though profits to the extent of $176,828.22 had been added to it during the same period.

2. That all of the statements prior to that of April 5, 1931, not only showed that the Carey note, on which Mr. Guth was responsible, was unpaid, both as to principal and interest, but, also, showed that such note was protected by the deposit of 50,000 shares of stock of the respondent company; whether, however, this collateral was still held by the Loft Company did not appear in that statement.

3. That during the presidency of Miller, the respondent corporation had purchased 52,500 shares of its capital stock, and while this item appeared as a corporate asset in some of the financial statements issued by the company, it did not appear in the statements of December 31, 1930, and April 5, 1931.

None of these facts were alleged in the petition as specific reasons for desiring to ascertain the value of the relator's stock, but they have some bearing on that question, and will be considered by us.

The relator does not deny that the amount of the corporate surplus as shown by its books appeared in the various

financial statements issued by the respondent. It apparently contends, however, that the substantial deductions in that account in the eleven months immediately following May 1, 1930, when the Guth faction took control of the affairs of the Loft Company, show such severe losses during that period as to indicate mismanagement, and that he is entitled to inspect the corporate books to ascertain the facts. All business enterprises had then been passing through a period of great depression, and shrinkages in the surplus account do not necessarily show mismanagement; neither do they always indicate that the transaction causing the losses reflected thereby took place then. Mr. Miller went out of office April 30, 1930, and it is, therefore, reasonable to assume that many of the items charged off of the corporate books and deducted from the surplus account related to transactions which occurred during his management, and with which he was presumably familiar. As a matter of fact, there is some evidence to that effect. Perhaps we might also add that the dictates of plain business honesty would seem to require the corporate management to strike all worthless items of any material amount from its books, so that they will reflect the reasonable value of its stock; and that in the absence of fraud, the adoption of such a course of procedure should cause neither suspicion nor criticism, nor a reason for penalizing the corporate management by a drastic investigation of their acts by an unfriendly person. There is not only nothing in the evidence to indicate fraud in the statements issued by the corporation, but they are also as explicit as most statements of that character, and we are not inclined to hold that a more detailed statement as to what particular items were deducted from the original corporate surplus is required. The statement of December 31, 1930, showed a charge of two hundred and seventy-four thousand dollars ($274,000.00) by way of adjustment of the inventory prices of December 31, 1929. Many other items charged off are also specifically explained in a note attached to that statement. These include accounts of no value because of the debts being in the hands of a receiver or in bankruptcy, fixtures in un-

profitable stores and other items including a net operating loss for the six months ending June 30, 1930, of $260,971.04.[1] While the relator has, therefore, been given all of the information to which he is reasonably entitled as to the corporate surplus, we think he is entitled to know whether the corporation still holds the collateral originally deposited with the Loft Company to protect the Carey-Guth note on which, so far as the statements indicate, the accrued interest has not even been paid. The same is true as to the fifty-two thousand, five hundred (52,500) shares of stock owned by the respondent corporation which did not appear in the financial statements issued by it after August 30, 1930.

The statement was made by one of the counsel. in the case that this stock was used as part payment on the purchase price of the Happiness Candy Company stock, but there is no evidence whatever in the record as to what actually became of such stock, and why it was not included in the recent financial statements. This is or was a corporate asset of considerable market value and we think the relator is reasonably entitled to information as to whether it is still owned by the respondent corporation. This disposes of the only contentions that were pressed by the relator at the argument, or in his brief.

It would seem that the parties could easily agree as to what corporate books and records would contain the information sought as to the shares of stock above referred to, but, if they cannot, such

[1]Surplus account for the year ending December 31, 1930.

| | | |
|---|---|---|
| Balance, December 31, 1929, as then reported | $2,351,512 | 52 |
| Deduct: | | |
| Write off deferred charges brought forward from 1929. Other period and extraordinary items, net | $ 109,097 | 79 |
| Write off of fixtures in unprofitable stores closed | 35,916 | 73 |
| Write off of loan and accounts originating in 1929 on Allison Drug Stores, Inc., now in bankruptcy | 308,922 | 86 |
| Allowances made on 1929 sales | 160,000 | 00 |
| Adjustments of December 31, 1929, valuations of inventories and other assets | 274,127 | 82 |
| Net loss from operations, six months ended June 30, 1930, as then reported | 260,971 | 04 |
| Adjustment for loss of commission, interest, etc., Allison Drug Stores, Inc. | 46,674 | 41 |
| | $1,195,710 | 65 |

an order for the issuance of a peremptory writ of mandamus for the inspection of such books and records as will carry this opinion into effect will be signed by the court.