MEAD CORPORATION, A DELAWARE CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 77819. Promulgated September 30, 1938

*Edward G. Ince, Esq., Robert McDougal, Jr., Esq.,* and *Theo. W. Brazeau, Esq.,* for the petitioner.

*F. R. Shearer, Esq.,* for the respondent.

OPINION.

OPPER: The record, consisting largely of stipulated facts and documents, clearly justifies our finding that the petitioner was both formed and availed of for the purpose of preventing the imposition of the surtax upon the income of the Mead family.

During the taxable year immediately preceding the organization of the petitioner and the Securities Corporation, the Mead family received Power Co. dividends amounting to $418,800 and paid surtaxes aggregating $43,445.48. During the taxable year their total surtaxes amounted to $4,209.33, most of which was upon income received from the Power Co. prior to the organization of petitioner. They therefore actually saved, or "prevented the imposition of" more than $40,000 in surtax alone during the taxable year. This was no mere accident. The Meads and their advisers were consciously and deliberately concerned with the reduction in surtaxes which the organization of petitioner would effect, and the plan, at least in part, was conceived with this in mind.

In April 1931 the attorney for the Meads outlined the plan of organization in a letter in which he said:

(5) The Mead Corporation shall declare such dividends as are necessary to pay its expenses and the dividends on the preferred stock, and to furnish you

with such funds as you may need for your personal investments. *All of the surplus funds will be paid to Mr. Isaac P. Witter* to liquidate your contract with him and the amounts proposed were set forth in the statement of estimated income and disbursements and retirements of the obligations which was forwarded to you January 29th. [Italics supplied.]

The January 29th letter referred to contains these statements:

I have made annual reductions in your indebtedness to Mr. Witter *in an amount in excess of that called for under the contract*, so that at the end of each year there will be a deficiency in income over disbursements with the exception of the year ending January 2, 1934. The reason for doing this will be explained later in this letter. * * *

*The purpose of creating a deficiency in income each year is to clearly prevent the organization of this company from falling within the provisions of Section 104* of the Revenue Act of 1928, which provides for a penalty (which has never been enforced) on a corporation that permits profits to be accumulated beyond the reasonable needs of the business. [Italics supplied.]

The "budget" of payments was carefully calculated on the basis of estimated Power Co. dividends, and all but a small fraction was to be withheld from payment to the Meads. Their tax adviser stated:

A. Well, I made up a lot of data and I consulted with the other officers of the Consolidated as to what we possibly could expect in the future in the way of earnings and dividends, and then I made up a statement for Mr. Mead showing how he could meet this obligation taking into consideration the savings accounts that Mr. Mead had in the then First National Bank of Wisconsin Rapids.

* * * * * * *

Q. Now, in this budget you estimated that the family corporation would receive dividends of about $417,000 annually and made provision for dividends to be paid to the members of the Mead family of about $88,500?

A. That is true.

Q. Which was a little more than one-fifth of the expected or estimated receipts during that time?

A. That is true.

The saving in surtax was specifically mentioned, the tax adviser saying in the same letter of January 29: "The savings in tax to you by the organization of a corporation, if the present rates are maintained, would exceed $300,000 [during the liquidation of the indebtedness to Mead's brother-in-law within the next six years] after taking into consideration the deduction you would have for interest paid on the contract and the amount of tax you will have to pay on the dividends you receive from this company * * *." The adviser, testifying as a witness, made it clear that he did not have in mind the saving which was brought about by reason of the fact that the transfers were made in connection with reorganizations in which gain was not recognized, for he said, "This $300,000 had nothing to do with the tax on the profit which might have arisen from the transfer of the stock, but it had to do with the income—ordinary income." Of this tax saving he said *"That was essential."*

And the plan thus outlined was the one that was carried out. George W. Mead testified:

Q. Were those the only letters that you received in connection with the proposed reorganization?

A. Yes.

Q. Did you authorize your accountant to carry out the proposed plan as outlined in that letter?

A. The letter from Brazeau?

Q. Yes.

A. Yes.

The above facts, and others appearing in the record, also tend to show that petitioner was availed of during the taxable year for the inhibited purpose. One that is of particular significance is the purchase of the bank stock. When "Mead decided to finance a new bank in Rockford" he caused petitioner to invest $235,000 in the bank stock and brought his nephew back from Florida and made him president of the bank, while he became chairman of its board of directors. He had no difficulty in bringing this about, for he was able to exercise complete domination and control over both corporations. He was president and treasurer of the Securities Co. and Mead Corporation and his sons were the other officers and directors. They were probably mere figureheads, as his testimony indicates. For instance, under cross-examination he was asked how the voting of the Power Co. stock was controlled and whether it was "through the Mead Corporation back through the G. W. Mead Securities Company." He testified:

Q. And those three men, that is, the directors of the Mead Corporation, are in turn chosen by a single vote in the name of G. W. Mead Securities Company, which is authorized by the same three men as directors of that company; isn't that right?

A. Well, I would like to have one of the men testify on that. That has to do with the organization. My understanding is that my wife and I vote the controlling interest of this family company. * * *

In other words, Mead did substantially the same thing that the sole stockholder did in *William C. DeMille Productions, Inc.*, 30 B. T. A. 826—used the funds of the corporation for his own personal use instead of having the corporation declare a dividend to him and thereby secure the funds to invest. See *Williams Investment Co.* v. *United States*, 3 Fed. Supp. 225; *Almours Securities, Inc.*, 35 B. T. A. 61; affd., 91 Fed. (2d) 427; certiorari denied, 302 U. S. 765; *Keck Investment Co.*, 29 B. T. A. 143; affd., 77 Fed. (2d) 244; certiorari denied, 296 U. S. 633. The *purpose* is the chief factor to be considered. *United Business Corporation of America*, 19 B. T. A. 809; affd., 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635. Cf. *Cecil B. DeMille*, 31 B. T. A. 1161; affd., 90 Fed. (2d) 12; certiorari de-

nied, 302 U. S. 713. And those concerned with the organization of petitioner, and with its operations during the year before us, must be presumed to have intended and purposed the logical and reasonable results of their acts. "In ordinary life it is not unreasonable to infer that the effect of a voluntary act is among the purposes of the actor." *R. L. Blaffer & Co.*, 37 B. T. A. 851. The evidence, it seems to us, clearly indicates that petitioner was both formed and availed of for the purpose of preventing the imposition of the surtax upon the Meads.

There may have been other objects contemplated in the organization and operation of the petitioner. Mead testified that he wished to keep voting control over the Power Co. stock in himself and his wife, and that he wanted to marshal all the stock of the family to pay off the Witter obligation. The lawyers and tax adviser testified that the petitioner was formed in addition to the Securities Corporation in order to insure that the several transfers would be tax-free under the reorganization provisions of the revenue act. But the fact that other purposes may have existed does not negative the co-existence of the purpose to avoid surtaxes. "Obviously a holding or investment corporation may be formed or availed of for several purposes, but it can not escape this tax unless it proves that it had no purpose to enable the escape of surtax." *R. L. Blaffer & Co.*, *supra*. If the only purposes of the organization and scheme of operation of the petitioner were those described by Mead and his advisers, the Meads could have removed any question of desire to avoid surtax by reporting their distributive shares of the petitioner's income in their own returns, even though not actually received, as permitted by section 104.

Nor does the existence of the Witter indebtedness have the effect of relieving petitioner from the provisions of section 104 on the ground that the accumulations were required for the reasonable needs of the business. In the first place, the plan was to accumulate income and pay it to Witter, *in excess of the contract obligations* as appears from the letter of January 29 quoted above, not on account of the reasonable needs of the business, but *for the express purpose of averting the application of section 104*. In the second place, the investment in the bank stock was clearly not dictated by the needs of the business, and these funds were accumulated in the year before us.

This brings us to a consideration of what may be regarded as petitioner's principal contention, that section 104 does not apply to petitioner because that section makes the tax applicable only when the effect of the formation or use of the corporation is to prevent the imposition of the surtax upon "its shareholders" and the Meads were not its shareholders within the meaning of the section.

Respondent argues that, if necessary to give full effect to the obvious legislative intent, we should ignore one of the separate corporate entities. That, of course, is sometimes done where "exceptional circumstances" or "peculiar situations" are shown to exist. *Southern Pacific Co.* v. *Lowe*, 247 U. S. 330; *Gulf Oil Corporation* v. *Lewellyn*, 248 U. S. 71; *United States* v. *Lehigh Valley Railway Co.*, 220 U. S. 257; *North Jersey Title Insurance Co.* v. *Commissioner*, 84 Fed. (2d) 898. It has also been done "where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose * * * of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. * * * In such a case the courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." *Chicago M. & St. Paul Ry. Co.* v. *Minneapolis Civic & Commerce Association*, 247 U. S. 490, 500. And it has been said that the above quoted rule is of particular importance in tax cases, *Western Maryland Railway Co.* v. *Commissioner*, 33 Fed. (2d) 695. Thus, a corporation set up as a mere conduit or agent may be ignored for tax purposes, *J. L. McInerney*, 29 B. T. A. 1; affd., 82 Fed. (2d) 665.

We prefer, however, to view this proceeding as a problem in statutory construction, and to base our conclusion upon the result reached by such treatment. The question, then, is: What meaning as applied to this proceeding should be given to the words "its shareholders"? Do those words signify only the Securities Corporation, or do they include the Meads? If the latter, then, since we have concluded that petitioner was organized and availed of to enable the Meads to avoid the payment of surtaxes, the section would become applicable. If the former, it would not.

In so far as this question is concerned, neither of the significant words is by itself so clear as to leave its meaning entirely certain. The word "shareholders" is synonymous with "owners of shares." *Continental Securities Co.* v. *Interborough R. T. Co.*, 165 Fed. 945, 963. But ownership has many aspects. For example, it may mean only legal title; it may mean equitable or beneficial title; or it may mean rights of direction, control, and enjoyment. The Supreme Court of Delaware, under the laws of which the corporations in question were incorporated, has held that "the stockholders of a corporation are the equitable owners of its assets", *State ex rel. Miller* v. *Loft, Inc.*, 156 Atl. 170. In *Munson Steamship Line* v. *Commissioner*, 77 Fed. (2d) 849, it was held that the parent cor-

poration was the "owner" of a vessel documented in the United States and operated in foreign trade, though the title to the vessel was in a wholly owned subsidiary. In that case the court said: "Indeed, to treat the parent corporation as the owner of the vessels operated through subsidiaries will serve the purpose of the statute better than would a literal interpretation *which confines 'owner' to the holder of legal title.*" [Italics supplied.] The National Bank Act (section 5151), laying a double liability on "the shareholders" of every national banking institution, has been held to apply to any former owner who transferred his shares to another person with notice of the insolvency of the bank and with fraudulent intent to evade liability. *McDonald* v. *Dewey*, 202 U. S. 510. [So also the word "its" is susceptible of several constructions. For example, the use of the word "its" in referring to a reorganized company has been held to authorize the determination "that what were 'earnings or profits' of the original, or *subsidiary*, company remain, for purposes of distribution, 'earnings or profits' of the successor, or *parent*, in liquidation" [emphasis ours], even though "the companies were separate juristic persons." *Commissioner* v. *Sansome*, 60 Fed. (2d) 931. "Too much meaning" may be "sought to be attributed to the word 'its.'" *Murchison's Estate* v. *Commissioner*, 76 Fed. (2d) 641.

It is therefore apparent that the language itself is at least ambiguous and we are both compelled and permitted to look elsewhere for its meaning, and to seek if possible to discover what was the actual intent of Congress in enacting the provision under consideration. "The rule that, where the statute contains no ambiguity, it must be taken literally and given effect according to its language, is a sound one not to be put aside to avoid hardships that may sometimes result from giving effect to the legislative purpose. *Commissioner of Immigration* v. *Gottlieb*, 265 U. S. 310, 313, 44 S. Ct. 528, 68 L. Ed. 1031; *Bate Refrigerating Co.* v. *Sulzberger*, 157 U. S. 1, 37, 15 S. Ct. 508, 39 L. Ed. 601. But the expounding of a statutory provision strictly according to the letter without regard to other parts of the act and legislative history would often defeat the object intended to be accomplished. * * * 'It is the duty of this Court to give effect to the intent of Congress. Primarily this intent is ascertained by giving the words their natural significance, but if this leads to an unreasonable result plainly at variance with the policy of the legislation as a whole, we must examine the matter further. We may then look to the reason of the enactment and inquire into its antecedent history and give it effect in accordance with its design and purpose, sacrificing, if necessary, the literal meaning in order that the purpose may not fail.'" *Helvering* v. *New York Trust Co.*, 292 U. S. 455. We should "not give effect to any contrivance which would defeat a tax Congress plainly

intended to impose", *Foster* v. *United States*, 303 U. S. 118. Words must not "be bent one way or the other but * * * be taken in the sense which will best manifest the legislative intent." *Sacramento Nav. Co.* v. *Salz*, 273 U. S. 326. To ascertain the Congressional intent "all appropriate canons of statutory construction" should be applied, and, "If, upon a consideration of the context and the objects sought to be attained and of the act as a whole, it adequately appears that the general words were not used in the restricted sense suggested * * *, we must give effect to the conclusion afforded by the wider view in order that the will of the legislature shall not fail." *Helvering* v. *Stockholms Enskilda Bank*, 293 U. S. 84.

Considering first the general objective of the legislation, we find that the declared purpose always has been to impose an additional tax or "remedial sanction" (see *Helvering* v. *Mitchell*, 303 U. S. 391) either upon the shareholders or upon the corporation itself, whenever "any corporation, however created or organized", has been formed or "availed of for the purpose of permitting parties to escape this additional tax [surtax]." Congressional Record, vol. 50, part VI, p. 5319 (63d Cong., 1st sess.). Would this purpose be more nearly achieved if the words in question are narrowly construed to exclude the stockholders of a parent corporation? We think it is obvious that it would not, and that the Congressional intention must have been otherwise.

This conclusion is fortified by a consideration of the history of the section. It first appeared in the original legislation enacted in pursuance of the Sixteenth Amendment.[2] Examination of its provisions makes it apparent that, although the tax was payable by the shareholders rather than the corporation, the language is broadly drawn and would clearly have been applicable to impose a tax on the Meads on facts similar to those here present. The intention to cover such a case as this is plain.

No material change in the language was made by the Act of 1916. In the 1918 Act, however, we find the phrase "its stockholders" first

---

[2] Tariff Act of 1913, sec. II, A, subd. 2.—

* * * For the purpose of this additional tax *the taxable income of any individual shall embrace the share to which he would be entitled of the gains and profits,* if divided or distributed, *whether divided or distributed or not, of all corporations,* joint-stock companies, or associations *however created or organized, formed or fraudulently availed of for the purpose of preventing the imposition of such tax through the medium of permitting such gains and profits to accumulate* instead of being divided or distributed; and the fact that any such corporation, joint-stock company, or association, is a mere holding company, or that the gains and profits are permitted to accumulate beyond the reasonable needs of the business shall be prima facie evidence of a fraudulent purpose to escape such tax; but the fact that the gains and profits are in any case permitted to accumulate and become surplus shall not be construed as evidence of a purpose to escape the said tax in such case unless the Secretary of the Treasury shall certify that in his opinion such accumulation is unreasonable for the purposes of the business. * * * [Italics supplied.]

used.[3]   And the context leaves it beyond any doubt that no change in the sense of the section was then intended.   The House of Representatives had passed the section in virtually its previous form, and had also provided for something very similar to the "undistributed surplus" tax of the 1936 Act.[4]   In the Senate the latter provision was deleted and the former changed into language substantially identical with its ultimate form.[5]   It was at this point that the words "its stockholders"

[3] PROFITS OF CORPORATIONS TAXABLE TO STOCKHOLDERS.

SEC. 220. That if any corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its stockholders or members through the medium of permitting its gains and profits to accumulate instead of being divided or distributed, such corporation shall not be subject to the tax imposed by section 230, but the stockholders or members thereof shall be subject to taxation under this title in the same manner as provided in subdivision (e) of section 218 in the case of stockholders of a personal service corporation, except that the tax imposed by Title III shall be deducted from the net income of the corporation before the computation of the proportionate share of each stockholder or member. The fact that any corporation is a mere holding company, or that the gains and profits are permitted to accumulate beyond the reasonable needs of the business, shall be prima facie evidence of a purpose to escape the surtax; but the fact that the gains and profits are in any case permitted to accumulate and become surplus shall not be construed as evidence of a purpose to escape the tax in such case unless the Commissioner certifies that in his opinion such accumulation is unreasonable for the purposes of the business. When requested by the Commissioner, or any collector, every corporation shall forward to him a correct statement of such gains and profits and the names and addresses of the individuals or shareholders who would be entitled to the same if divided or distributed, and of the amounts that would be payable to each.

[4] Revenue Bill of 1918 (H. R. 12863) ; 65th Cong., 2d sess.; House Report No. 767 (Part III.—Corporations. Tax on Corporations)—

SEC. 230. That there shall be levied, collected, and paid for each taxable year upon the net income of every corporation a tax as follows:

(a) In the case of a domestic corporation 18 per centum of the amount of the net income in excess of the credits provided in, section 236 : *Provided,* That the rate shall be 12 per centum upon so much of this amount as does not exceed the sum of (1) the amount of dividends paid during the taxable year, plus (2) the amount paid during the taxable year out of earnings or profits in discharge of bonds and other interest-bearing obligations outstanding prior to the beginning of the taxable year; and  *  *  *.

[5] For convenience, an excerpt from the comparative print submitted by the Conference Committee is here set forth, the deleted portions being from the original House proposal, the italicized portions the Senate additions, the part set out in capitals and that deleted as indicated by brackets being an amendment to the Senate amendment proposed by the Conference Committee, and the numbers in parentheses indicating the numbers of the Senate amendments:

"II. R. 12863—As Agreed to in Conference.

"(99) ~~UNDISTRIBUTED PROFITS SUBJECT TO SURTAX~~ PROFITS OF COR-PORATIONS TAXABLE TO STOCKHOLDERS

"SEC. 220. That (100) ~~for the purpose of the surtax the net income of any individual includes the share to which he would be entitled of the gains and profits, if divided or distributed, whether divided or distributed or not, of all corporations~~ *if any corpo-ration,* however created or organized, (101) *is* formed or (102) ~~fraudulently~~ availed of for the purpose of preventing the imposition of (103) ~~such tax~~ *the surtax upon its stockholders or members* through the medium of permitting (104) ~~such~~ *its* gains and profits to accumulate instead of being divided or (105) ~~distributed;~~ *distributed, such corporation shall not be subject to the tax imposed by section 230* [or by Title III], *but the stockholders or members thereof shall be subject to taxation under this title in the same manner as provided in subdivision (e) of section 218 in the case of stockholders of a personal service corporation,* EXCEPT THAT THE TAX IMPOSED BY TITLE III SHALL BE DEDUCTED FROM THE NET INCOME OF THE CORPORATION BEFORE THE COMPUTATION OF THE PROPORTIONATE SHARE OF EACH STOCKHOLDER OR MEMBER. (106) ~~and the~~ (107) *The* fact that any (108) ~~such~~ corporation is a mere holding company, or that the gains and profits are permitted to accumulate beyond the

appeared; but they were evidently regarded as synonymous with "the stockholders" of "any corporation", and those phrases are used interchangeably by the Senate Committee.[6]   The only change intended was that "This amendment eliminates the necessity of proving fraud when earnings of a corporation are allowed to accumulate for the purpose of preventing the imposition of the surtax upon the stockholders."[7]   And the amendments changing the language from the previous act to that used in 1918 are stated to be "Clerical Changes; and the House recedes."[8]   Thus it must be concluded that no constriction of the previous broad provisions was even suggested, and that the only object

reasonable needs of the business, shall be prima facie evidence of a (109) ~~fraudulent~~ purpose to escape (110) ~~such tax~~ *the surtax*; but the fact that the gains and profits are in any case permitted to accumulate and become surplus shall nòt be construed as evidence of a purpose to escape the tax in such case unless the (111) ~~Secretary~~ *Commissioner* certifies that in his opinion such accumulation is unreasonable for the purposes of the business.   When requested by the Commissioner, or any collector, every corporation shall forward to him a correct statement of such gains and profits and the names and addresses of the individuals or shareholders whò would be entitled to the same if divided or distributed, and of the amounts that would be payable to each."

[6] Revenue Bill of 1918; Report of Senate Finance Committee, 65th Cong., 3rd sess.; Senate Report No. 617, p. 5—

### Income of Certain Corporations Taxable to Stockholders.

It was believed that the incentive to withhold from distribution as dividends earnings not required for legitimate business uses exists chiefly in the case of certain corporations the stock of which is very closely held, and that the encouragement of distribution sought to be accomplished by the different rate on corporations in the House bill could be better accomplished by changes in the provision dealing with such closely held corporations (sec. 220).   The section of the present law, incorporated in the House bill, providing that undistributed profits of a corporation may in certain cases be treated as part of the income of *its stockholders* subject to surtax, has proved to be of little value, because it was necessary to its application that intended fraud on the revenue be established in each case.   The committee has done away with this requirement and has provided that *in the case of any corporation formed or availed of for the purpose of permitting gains or profits to accumulate instead of being divided the income shall be taxed to the stockholders in the same way that partnership earnings are taxed to partners.*   [Italics supplied.]

[7] Statement of Managers on the Part of the House, footnote 8 below.   See also Statement of Senator Simmons, Chairman of Senate Finance Committee, Congressional Record, vol. 57, part I, p. 253, 65th Cong., 3rd sess.

[8] The relevant excerpt from the House Managers' Statement follows, the amendment numbers being those appearing in footnote 5, *supra* (Revenue Bill of 1918; Conference Report, 65th Cong., 3rd sess.; House Report No. 1037, p. 52) :

### "Statement of the Managers on the Part of the House

"Amendments Nos. 97, 98, 99, 100, 101: These amendments are clerical changes; and the House recedes.

"Amendment No. 102 : This amendment eliminates the necessity of proving fraud when earnings of a corporation are allowed to accumulate for the purpose of preventing the imposition of the surtax upon the stockholders or members; and the House recedes.

"Amendments Nos. 103, 104: These amendments are clerical changes; and the House recedes.

"Amendment No. 105 : This amendment provides that, when the Commissioner of Internal Revenue certifies that an accumulation of profits is, in his opinion, to enable the stockholders of a corporation to avoid payment of the surtaxes, such corporation shall not be subject to the corporation income tax or the excess or war profits taxes, but that the stockholders shall be subject to taxation in the same manner as in the case of stockholders of a personal service corporation.   The House recedes from its disagreement to this amendment with an amendment adopting the Senate amendment, but providing that

sought to be attained by the altered language was a further broadening of the scope of the section.

In 1921 there appears a further change, presumably made necessary by the decision in *Eisner* v. *Macomber*, 252 U. S. 189.[9] That was to transfer the burden of the tax from the shareholders to the corporation. The phrase "its stockholders" continues to be employed similarly to its previous use, and thus no intention to limit the original broad application of the term may be inferred. Except for changes in the rate of tax, that portion of the section was thereafter reenacted in substantially the same form up to and including the 1928 Act which is applicable here.

Finally, and in our opinion as a conclusive indication of the intention of each succeeding Congress which has dealt with the section, the amendment inserted in the 1924 Act, and reenacted in 1926 and 1928, shows that the phrase we are considering must be so applied as to include the shareholders of a parent corporation. This amendment was the insertion of what appears as subdivision (c) of the section in the 1928 Act,[10] and has the effect of adding dividends received to the income of a corporation subject to the tax. The purpose of that amendment is stated to be to make the tax effective as applied to a "holding company."[11] Thus, Congress envisaged the existence of the very corporate relationship here present, and the possibility that a corporation, situated as the Securities Corporation was here, might escape the burden of the tax imposed by section 104 in so far as its income consisted of dividends from its subsidiary.

---

in case a corporation is taxed on the basis of this amendment in the manner provided for personal service corporations, it shall also be subject to the excess or war profits taxes.

"Amendments Nos. 106, 107, 108, 109, and 110 : These amendments are clerical changes ; and the House recedes.

"Amendment No. 111 : This amendment provides that the Commissioner of Internal Revenue instead of the Secretary of the Treasury shall certify the cases in which, in his opinion, the accumulation of earnings is unreasonable for the purpose of the business ; and the House recedes."

[9] Revenue Bill of 1921 ; Report of Senate Finance Committee, 67th, Cong., 1st sess. ; Senate Report No. 275, p. 16—

Section 220 of the existing law provides that if any corporation is formed or availed of for the purpose of evading the surtax upon its stockholders, through the medium of permitting its gain and profits to accumulate instead of being divided, the stockholders shall be taxed in the same manner as partners. By reason of the recent decision of the Supreme Court in the stock-dividend case (*Eisner* v. *Macomber*, 252 U. S. 189), considerable doubt exists as to the constitutionality of this provision of existing law. Section 220 of the bill therefore proposes to amend section 220 of the existing law so as to impose upon corporations of the character above described a flat additional tax of 25 percent ; but, if the stockholders agree, they may be taxed upon their distributive shares in the net income of the corporation in the same manner as members of a partnership, such taxes to be in lieu of all income taxes upon the corporation.

[10] See footnote 1, *supra*.

[11] Revenue Bill of 1924 ; Report of Senate Finance Committee, 68th Cong., 1st sess. ; Senate Report No. 179, p. 21—

SEC. 220 :

This section of the Revenue Act of 1921 imposes upon a corporation formed or availed of for the purpose of preventing the imposition of the surtax upon its stockholders by failing to distribute its gains and profits a tax of 25 per cent of its net income. This

Congress accordingly took steps to make the tax effective as to the parent corporation. But it must at once be apparent that this amendment would have been footless except on the assumption that the subsidiary would declare the dividends in the first place. Since the legislation was by definition dealing with corporations used to accumulate surplus, such a declaration by the controlled subsidiary could only be expected as the result of effective compulsion; and since the function of section 104 was to exercise that compulsion to declare dividends which would otherwise be withheld, Congress must have been satisfied that the section, in its unamended form, was alone sufficient to compel distribution, or tax nondistribution, by the subsidiary. We can not escape the conclusion that Congress, when it added subdivision (c), must have regarded the tax imposed by section 104 as necessarily applicable to a corporation situated as was petitioner, and to have feared the ultimate avoidance of the surtax on individuals not by any immunity from the tax enjoyed by the subsidiary (the petitioner here), but by the accumulation in the parent of earnings distributed by the subsidiary for the very purpose of itself avoiding the tax. To state the matter somewhat differently, Congress took pains by the enactment of subsection (c) to prevent escape from this tax by the use of a "holding company" owning the stock of a subsidiary. Can it be presumed that nevertheless it was the intention to leave a plain, open, and obvious method of escaping the tax by the use of the subsidiary? Yet that is the presumption that must be indulged in unless we conclude that Congress considered the situation of the subsidiary to be sufficiently covered by reenactment of the remaining provisions of section 104, particularly subdivision (a) thereof. And it is the legislative intent in that reenactment with which we are here concerned. Since only by such a construction of the provisions of subdivision (a) can we make the provisions of subdivision (c) effective, we think there is an added reason of great force for including the shareholders of a parent corporation within the meaning of the term under consideration. "It is a well-settled rule of construction that a statute should, if possible, be

---

section is ineffective in the case of the holding company which fails to distribute its gains and profits, since its net income consists entirely of dividends from the corporation, the stock of which it owns, which under the law do not form a part of the net income of the holding company. Subdivision (d) of the bill corrects this error and also provides that in computing the net income of such corporation for the purpose of this section the amount of interest on Liberty bonds must be included if the interest on such bonds would be subject to tax in the hands of an individual owner. Under the present law such interest is not included in computing the net income of the corporation, since Liberty bonds (except the 3½ per cent issue) are not taxed to a corporation, although subject to surtax in the hands of an individual owner.

Section 220 of the existing law also provides that the fact that any corporation is a mere holding company shall be prima facie evidence of purpose to escape a surtax. The Treasury Department has had difficulty in applying the section to the case of pure investment companies which reinvest their entire net income. The bill, therefore, makes the fact that any corporation is a mere "holding or investment company" prima facie evidence of the purpose to escape the surtax.

so construed as to give meaning to all parts of it." *Gilbert* v. *Commissioner*, 56 Fed. (2d) 361.

It has been suggested that the amendment included in the 1934 Act,[12] which put the question we are considering beyond any possible doubt, is evidence that Congress believed a change to be necessary, and therefore that the section had meant something different previously. Without considering the effect of the decision by one Congress as to the meaning of legislation enacted by another, it is sufficient to say here that there is no evidence that the change in language so made was anything more than clarification, or that there was any intention to enact a new or different provision. Although the Ways and Means Committee Report "pointed out" the application of the section to the "shareholders of a parent corporation", it referred to "two important *changes*" it proposed, neither of which is the altered language significant here.[13] The Senate Finance Committee Report contains no mention of this altered language which was added by the House, but states only that "The House bill changes the existing law in two respects" (those discussed in the House Report) indicating that the Senate likewise did not view the language here in question as changing the existing law.[14] There had been some question raised as to the meaning of the section,[15] and under such circumstances a desire for clarification is easily conceivable. We are not required thereby to assume that any change of the previous law was intended. "Mere change of language does not necessarily indicate intention to change the law. The purpose of the variation may be to clarify what was doubtful and so to safeguard against misapprehension as to existing law." *Helvering* v. *New York Trust Co.*, *supra*.

Nor does the form of respondent's regulations prior to the 1934 Act require any different conclusion. Even the most casual examina-

---

[12] SEC. 102. SURTAX ON CORPORATIONS IMPROPERLY ACCUMULATING SURPLUS.

(a) IMPOSITION OF TAX.—There shall be levied, collected, and paid for each taxable year upon the adjusted net income of every corporation (other than a personal holding company as defined in section 351) if such corporation, however created or organized, is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of any other corporation, through the medium of permitting gains and profits to accumulate instead of being divided or distributed, a surtax equal to the sum of the following:

(1) 25 per centum of the amount of the adjusted net income not in excess of $100,000, plus

(2) 35 per centum of the amount of the adjusted net income in excess of $100,000.

[13] 73d Cong., 2d sess., House Report No. 704, pp. 12, 26.

[14] 73rd Cong., 2d sess., Senate Report No. 558, p. 31.

[15] See, e. g., Paul and Mertens, Law of Federal Income Taxation (1934), vol. 5, p. 436 (footnote):

"Surtaxes were, of course, payable only by individuals. Many people have supposed for many years that this provision could be evaded by having two corporations instead of one. The profits would be accumulated in one of the corporations and the stock of that corporation would be held by the other corporation the stock of which would be held by an individual. In such cases the corporation accumulating the profits would not be preventing the imposition of surtaxes upon its shareholders because its shareholders would be a corporation which would not be subject to surtaxes. This theory perhaps unduly emphasizes the doctrine of corporate entity. * * *"

tion will show that the regulations[16] merely followed the language of the statute, and were therefore as broad as the provision of law upon which they were based. If anything, one excerpt indicates an intention to treat subsidiary and parent as a single entity, at least in certain described situations.[17] It would be a curious result if it were insisted that the regulations be regarded as construing the law one way to benefit one taxpayer (the parent) and the opposite way to benefit another (the subsidiary).

We accordingly conclude that petitioner was formed, and availed of in the tax year before us, for the purpose of preventing the imposition of the surtax upon its shareholders, within the meaning of section 104 of the Revenue Act of 1928. In arriving at this conclusion we have been guided by the principles stated in *Helvering* v. *Stockholms Enskilda Bank*, *supra*, from which we quote at length because of its particular applicability to the facts before us:

In the foregoing discussion, we have not been unmindful of the rule, frequently stated by this court, that taxing acts "are not to be extended by implication beyond the clear import of the language used," and that doubts are to be resolved against the government and in favor of the taxpayer. The rule is a salutary one, but it does not apply here. The intention of the lawmaker controls in the construction of taxing acts as it does in the construction of other statutes, and that intention is to be ascertained, not by taking the word or clause in question from its setting and viewing it apart, but by considering it in connection with the context, the general purposes of the statute in which it is found, the occasion and circumstances of its use, and other appropriate tests for the ascertainment of the legislative will. Compare *Rein* v. *Lane*, L. R. 2 Q. B. Cases 144, 151. The intention being thus disclosed, it is enough that the word or clause is reasonably susceptible of a meaning consonant therewith, whatever might be its meaning in another and different connection. We are not at liberty to reject the meaning so established and adopt another lying outside the intention of the Legislature, simply because the latter would release the taxpayer or bear less heavily against him. To do so would be not to resolve a doubt in his favor, but to say that the statute does not mean what it means.

Reviewed by the Board.

*Decision will be entered for the respondent.*

STERNHAGEN concurs only in the result.

---

[16] [Regulations 74.] ART. 541. *Taxation of corporation utilized for evasion of surtax.*—Section 104 is designed to discourage the formation or use of a corporation for the purpose of preventing the imposition of surtaxes upon its shareholders, through the device of permitting its gains and profits to accumulate instead of being distributed. If a domestic or foreign corporation is so formed or availed of, it is subject to a tax at the rate of 50 per cent upon its net income in addition to the tax imposed by section 13. * * *

[17] [Regulations 74.] ART. 542. * * * When one corporation owns the stock of another corporation in the same or a related line of business and in effect operates the other corporation, the business of the latter may be considered in substance the business of the first corporation. Gains and profits of the first corporation put into the second through the purchase of stock or otherwise may therefore, if a subsidiary relationship is established, constitute employment of the income in its own business. To establish that the business of one corporation can be regarded as including the business of another it is ordinarily essential that the first corporation own substantially all of the stock of the second. * * *

LEECH, dissenting: The Mead Corporation is contesting the imposition of a tax amounting to 50 percent of its net income. The authority for that imposition is said to be section 104 of the Revenue Act of 1928. In *United Business Corporation of America*, 19 B. T. A. 809; affd., 62 Fed. (2d) 754; certiorari denied, 290 U. S. 635, the Board held that a similar provision, authorizing just half this tax, was "highly penal." This language was then used: "While the plain intent of such a statute must be given full effect, it should be strictly construed and should not be extended to cover cases which do not fall within its letter." Is the Mead Corporation "within the letter" of section 104, *supra*? I think not.

The tax, of course, can not be supported except upon a finding that the Mead Corporation was "formed or availed of for the purpose of preventing the imposition of the surtax upon *its shareholders* * * *." (Emphasis supplied.) That fact can not be found. The majority opinion does not find it. Rather, it finds that "The petitioner was formed and availed of for the purpose of avoiding the imposition of surtax upon the members of the Mead family, particularly George W. Mead and his wife, Ruth W. Mead." Then, after a considerable discussion, it concludes, as a matter of law, that, for the purposes of the statute, the Mead family, and those mentioned particularly, were the shareholders of the Mead Corporation.

The necessary premise for that conclusion is either that the corporate entity of the Securities Corporation be ignored, or the words "its shareholders" be construed to mean the shareholders of the Securities Corporation. Neither premise is sound.

The corporate entity of Securities Corporation can not be ignored here any more than that of the Mead Corporation. They are both going corporations. The rule is well settled that neither a purpose to avoid income taxes nor the ownership of all the stock of a corporation by one family or person affords sufficient reason to disregard the entity of the corporation. *Burnet* v. *Commonwealth Improvement Co.*, 287 U. S. 415; *Burnet* v. *Clark*, 287 U. S. 410; *Dalton* v. *Bowers*, 287 U. S. 404; *Klein* v. *Board of Supervisors*, 282 U. S. 19; *Jones* v. *Helvering*, 71 Fed. (2d) 214; *Helvering* v. *Gregory*, 69 Fed. (2d) 809; affd., 293 U. S. 465; *Nixon* v. *Lucas*, 42 Fed. (2d) 833; *Consumers Construction Co.* v. *Commissioner*, 94 Fed. (2d) 731; *James Lee Johnson*, 37 B. T. A. 155; *George W. Griffiths*, 37 B. T. A. 314; *General Securities Co.*, 38 B. T. A. 330. The only alleged infirmity which might be said to have affected the Securities Corporation is that it "was formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders." But the existence

of that same infirmity, in the formation or use of the Mead Corporation, is the sole premise for the disputed tax against that corporation, as a corporation. Section 104, *supra*, recognizes the Mead Corporation as a corporation. See *Rands, Inc.*, 34 B. T. A. 1094. *A fortiori*, the corporate entity of Securities Corporation must be recognized.

That such recognition was intended here is emphasized in the Revenue Act of 1934, section 102. The imposition of the tax upon the corporation is there authorized if it is "formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders or the shareholders of *any other* corporation." (Emphasis supplied.)

However, as I understand the majority opinion, it attempts to avoid ignoring the entity of the Securities Corporation. It does this by suggesting that, for present purposes, the shareholders of that corporation are the equitable owners of its assets, composed of the stock of petitioner; or that, because of their "rights of direction, control, and management" of those assets, through control of the Mead Securities Corporation, the shareholders of that corporation are the shareholders of the petitioner. The only authorities cited, possibly requiring comment, are *State ex rel. Miller* v. *Loft, Inc.*, 156 Atl. 170, and *Munson Steamship Line* v. *Commissioner*, 77 Fed. (2d) 849. The first was a case in the lower courts of Delaware involving the right of a shareholder to inspect the corporate books. A sufficient answer to anything that was there said would seem to be an excerpt from the opinion of Justice Holmes in *Klein* v. *Board of Supervisors, supra:*

\* \* \* But it leads nowhere to call a corporation a fiction. If it is a fiction, it is a fiction created by law with intent that it should be acted on as if true. The corporation is a person and its ownership is a nonconductor that makes it impossible to attribute an interest in its property to its members. *Donnell* v. *Herring-Hall-Marvin Safe Co.*, 208 U. S. 267, 273. \* \* \*

See *Rhode Island Trust Co.* v. *Doughton*, 270 U. S. 69; *Eisner* v. *Macomber*, 252 U. S. 189; *Gibbons* v. *Mahon*, 136 U. S. 549.

In the *Munson Steamship Line case, supra*, the petitioner's ownership of the stock of the subsidiary company was not the only premise of the decision. The court supported its reversal of the Board, on the absolute measure of direct control of the ships of the subsidiary and their earnings, exercised by the parent, upon the basis of which peculiar facts, it then disregarded the corporate entity of the subsidiary. Here no such direct measure of control existed. And, as I think has been amply demonstrated, the corporate entity of Mead Securities Corporation can not consistently be ignored. Then again, and of the highest importance, the court there was construing a law which, because it sought to grant a benefit to the taxpayer, was liberally construed. Here the exact converse situation exists. We are

construing a "highly penal" statute which "should be strictly construed and should not be extended to cover cases which do not fall within its letter." *United Business Corporation of America, supra.*

The majority opinion holds that the meaning of "its shareholders" as used in section 104, *supra*, is ambiguous. It then proceeds to construe the legislative intent of the section. In so doing, it uses the history of the section, other legislation, committee reports and data, the source of all of which is outside the disputed statute. The opinion then concludes that the shareholders of the Securities Corporation are within the meaning of "its shareholders" as used here. *Helvering* v. *Stockholms Enskilda Bank*, 293 U. S. 84, is cited as its authority. But, assuming "its shareholders", as used in this section, is ambiguous, we are even then limited in our construction of that expression to "a meaning consonant" with the meaning of "its shareholders." *Helvering* v. *Stockholms Enskilda Bank, supra; Caminetti* v. *United States*, 242 U. S. 470. In that case the Supreme Court held that the words "obligations of the United States" might be construed as having one meaning in one section of the statute and another meaning in another section of the same statute, so long as such a legislative intention was properly disclosed. But the Court there did not construe "obligations of the United States" to include obligations of Canada or those of any obligor other than the United States. Thus, assuming ambiguity here, "its shareholders" can not be construed to mean the shareholders of any corporation other than the Mead Corporation upon the authority of that case nor of any other, so far as I know.

However, "its shareholders," as used in section 104, *supra*, is not ambiguous. It can mean only the shareholders of the corporation against whom the tax is imposed. Any study of the section, itself, discloses this beyond question. If the slightest doubt existed, it is convincingly removed by the administrative provision under which the Commissioner or any collector may require the corporation to furnish "a correct statement of such gains and profits and the names and addresses of the individuals or shareholders who would be entitled to the same if divided or distributed, and of the amounts that would be payable to each." [1]

The respondent, in his regulations construing section 220 of the Revenue Act of 1921, which was the first enactment of this provision, recognized that "its shareholders" included only the shareholders of the taxed corporation.[2] Those regulations never attempted to include within the scope of a statute, a corporation formed or used to prevent the imposition of surtax upon the shareholders of any other corpo-

---

[1] Sec. 220, Revenue Act of 1921; sec. 220 (c), Revenue Acts of 1924 and 1926, included in the Revenue Act of 1928 as sec. 149 (c).

[2] Regulations 62, art. 351.

ration. A mere reading of these regulations, *in their entirety*, leaves no doubt of that. Congress reenacted section 220 of the Act of 1921, without material change, except in the tax rates, as sections 220 of the Revenue Acts of 1924 and 1926 and section 104 of the Revenue Act of 1928. Respondent did not change his regulations under those acts.[3] Those repeated reenactments, coupled with the consistent administrative interpretation of the provision, furnish compelling authority for this construction. *New York, New Haven & Hartford Railroad Co.* v. *Interstate Commerce Commission*, 200 U. S. 361; *Komada* v. *United States*, 215 U. S. 392; *United States* v. *Hammers*, 221 U. S. 220; *Commissioner* v. *Pontarelli*, 97 Fed. (2d) 793, affirming 35 B. T. A. 872; *Reynolds Tobacco Co.* v. *Commissioner*, 97 Fed. (2d) 302, reversing 35 B. T. A. 949; *Squibb & Sons* v. *Commissioner*, 95 Fed. (2d) 69.

Finally, such construction finds irresistible support in the fact that Congress in the Revenue Act of 1934, section 102 (a), the counterpart of section 104 (a), *supra*, changed section 104 and specifically included "or the shareholders of any other corporation." The Report of the Ways and Means Committee which accompanied the Revenue Bill of 1934 significantly "pointed out" this change.[4] Respondent, in his regulations construing this later act, for the first time added a provision giving effect to the change.[5]

The Supreme Court said in *Caminetti* v. *United States*, *supra*:

\* \* \* But, as we have already said, and it has been so often affirmed as to become a recognized rule, when words are free from doubt they must be taken as the final expression of the legislative intent, and are not to be added to or subtracted from by considerations drawn from titles or designating names or reports accompanying their introduction, or from any extraneous source. \* \* \*

See also *United States* v. *Standard Brewery*, 251 U. S. 210; *Adams Express Co.* v. *Kentucky*, 238 U. S. 190.

The Board has recently recognized this rule in its application to a statute certainly no more ambiguous than section 104, *supra*, in *Montague Miles & Co.*, 38 B. T. A. 144.

There is no doubt about the meaning of "its shareholders" here. It means, only, the shareholders of the Mead Corporation. The only doubt is whether Congress meant to authorize the imposition of this tax upon the occurrence of another and wholly separate condition, not included in section 104. That doubt arises, not from anything in the statute, itself, but from sources outside the statute. But, as the

---

[3] Regulations 65, art. 351; Regulations 69, art. 351.
[4] House Report 704; 73d Cong., 2d sess., p. 12.
[5] Regulations 86, art. 102–1.

Supreme Court said in *Wisconsin Railroad Commission* v. *C., B. & Q. Railroad Co.*, 257 U. S. 563, at page 589: "Such aids are only admissible to solve doubt and not to create it."

Assuming the existence of the necessary facts, it may have been. a legislative mistake that, under section 104, *supra*, the Mead Corporation should escape this tax. However, that mistake, particularly in such a highly penal statute, affords the Board no proper authority for supplying, as it seems to me the majority opinion does, what Congress omitted.

VAN FOSSAN, MURDOCK, BLACK, TYSON, AND KERN agree with this dissent.