JOHN W. VERNAM, Jr., RELATOR, v. BLAINE W. SCOTT ET AL., DEFENDANTS.

Submitted October 13, 1933—Decided February 1, 1934.

Before Justices CASE, BODINE and DONGES.

For the relator, *Minton & Rogers.*

For the respondents, *George A. Cella.*

PER CURIAM.

This is an application for an alternative or peremptory writ of *mandamus* by a stockholder to compel the defendant corporation, Crane Milk Company, and its president, Blaine W. Scott, to permit an examination of the books of the corporation by the relator and an accountant. The relator is the holder of forty-four shares of preferred stock of the defendant corporation which he acquired as part payment for a dairy business which he conveyed to the company early in 1930 when it was organized to take over the business of ten independent dairies operating in and about the city of Trenton.

It seems clear that a stockholder is entitled to examine the books of the company unless it be shown that the examination is not sought in good faith and for some ulterior motive. This is the issue in the case, the defendants having sought by the voluminous testimony to establish that the relator is not acting in such good faith as to be entitled to the assistance of the prerogative writ of this court. *Feick* v. *Hill Bread Co.,* 91 *N. J. L.* 486; 103 *Atl. Rep.* 813; *affirmed,* 92 *N. J. L.* 513; 105 *Atl. Rep.* 725.

As stated, the evidence is voluminous and it is difficult to ascertain the true situation. The relator was one of ten milk dealers who in March, 1930, conveyed their business to Crane Milk Company, a subsidiary of United States Dairy Products Corporation. Five of these dealers were given employment with the new company. All of them signed agreements covenanting not to engage in the dairy business in and around Trenton for a period of years, five years in some cases and ten years in others. The relator was given the position of sales manager at a salary of $56 per week, which employment lasted until July 14th, 1933.

At the time relator sold his business, he received in addition to the forty-four shares of seven per cent. cumulative preferred stock, approximately $4,500 in cash. Dividends were paid on the stock until July 1st, 1933, the payment due on that date being passed, as was that due on October 1st, 1933. Payment of dividends of the stock of Crane Company held by relator was guaranteed by the United States Dairy Products Corporation.

The conflict in the testimony centers around the conduct of the relator whilst employed by defendant. Dissatisfaction arose among the employes of defendant who had sold it their businesses and covenanted not to enter into competition. Some of them left the employ of defendant and started milk routes of their own, which resulted in suits in the Court of Chancery by which Crane Company secured injunctions enforcing the aforementioned covenants in the agreements of sale.

Mr. Scott, the president, being dissatisfied with the business of the company under the management of sales by relator, brought to Trenton from another branch of the parent company one F. Randolph Miller and placed him in authority above relator. This action clearly appears to have been resented by relator, and from that time on his attitude toward the employer by whom he was being paid seems to have definitely changed. Miller testified that the orders posted by himself and Mr. Scott were freely criticised by relator who would tell the men under him that the orders were impossible of execution.

There is in the record the testimony of one Davis, a driver of defendant, who sold his business in like manner to the company, to the effect that at the time when the trouble arose among the drivers, the relator in company with two other employes called at his house and discussed whether or not they should remain with defendant or leave its employ. On this occasion relator said to Davis that "he wished he could count on you and Lear the same as he could count on the rest of them." This conveyed to Davis that relator wished he could count on him and Lear quitting defendant's employ as much as he could count on the rest of the men involved quitting.

Joseph B. Scudder, a dairy farmer who sold milk to defendant, testified to a conversation with the relator during the course of which relator "said he was out to get Mr. Scott."

Relator was finally transferred to Atlantic City for a period, in order, as Scott says, to see if his attitude toward co-operating with his superiors in Trenton would change. While in Atlantic City, according to the testimony of Wilson, a foreman, relator caused dissatisfaction among the drivers by telling them they were not being paid sufficient money for their sales in connection with a contest which the company was conducting. While relator was in Atlantic City he met one Blumberg, a former employe of Crane Company, who was out of work. Relator informed Blumberg that George Reck, Jr., one of the employes who had quit defendant company, was attempting to organize certain of the other employes and former employes into a company to compete with Crane Company. He advised Blumberg to get in touch with Reck and gave him thirty cents to telephone him at Trenton.

After his return to Trenton, relator's relations with the company ceased, he stating that he was discharged and the company insisting that he quit.

The defendants offered other testimony of acts on the part of the relator which they claim show his lack of good faith in other respects.

The situation presented by the testimony leads to the conclusion that the relator's conduct has not been such as to entitle him to the extraordinary aid of this court. He was dis-

loyal to the employer which was paying him his weekly salary; he failed and refused to co-operate with his superior officers; he counseled with those who were leaving the company and attempting to ruin its business by violating their covenants; all this while he was an employe and stockholder of the company which he now says was mismanaged. The failure to pay dividends is no evidence of mismanagement, because many large and well managed companies have during the period of economic depression been forced to forego payment of dividends on their preferred stocks.

Relator seems to be motivated largely by a feeling of animus toward Mr. Scott, the president, and other employes of the Crane Company. He stated he would "get Mr. Scott."

In *McMahon* v. *Dispatch Printing Co.,* 101 *N. J. L.* 470; 129 *Atl. Rep.* 425, *mandamus* was denied because the evidence showed bad faith, and that the application was actuated by personal hostility against the president of the corporation, without any proof of mismanagement.

Relator makes a point of the fact that the annual reports of the corporation to the secretary of state for the years 1930 and 1932 do not show the issue of preferred stock of which relator's holding is a part as outstanding. It is admitted that these reports are erroneous and that relator holds valid stock.

Relator relies upon evidence of a decrease of business as evidence of mismanagement, but it appears that this loss of business was caused in part at least by the conduct of relator and other employes of defendant who, having sold their businesses and taken employment, became dissatisfied with their situations.

Relator contends that the evidence creates a suspicion that some of the dividends paid on preferred stock were not paid out of earnings, and that this is evidence of mismanagement. The testimony is not sufficient to sustain this argument.

*In re De Vengoechea,* 86 *N. J. L.* 35; 91 *Atl. Rep.* 314, lays down the rule that the power to order an inspection of the books of a corporation is so great, and its exercise may have such ruinous consequences, that it will be ordered only when "a case is presented which indicates not only a *bona fide* desire to safeguard the interests of all stockholders but **a**

probability that the interests of all will be served by the proposed investigation."

On the whole the relator's reasons for seeking the detailed examination of all the books of the corporation are not impressive. His application has the marks of a fishing expedition, designed to find some entering place for a wedge to injure the corporation and possibly drive it out of business. It does not appear to be in the interest of the stockholders. The fact that he is under contract not to enter into competition for a period of time is significant.

The rule is discharged and the application for the writ is denied, with costs.