PANHANDLE COOPERATIVE ROYALTY COMPANY, a Corporation, Bill Darnell, individually and as President of Panhandle Cooperative Royalty Company, a Corporation, V. E. Stinchcomb, individually and as Vice-President of Panhandle Cooperative Royalty Company, a Corporation, W. D. Housh, individually and as Secretary-Treasurer of Panhandle Cooperative Royalty Company, a Corporation, and B. Blackwell, individually and as Assistant Secretary-Treasurer of Panhandle Cooperative Royalty Company, Plaintiffs in Error,

v.

M. L. McLAIN, L. A. Martin, E. E. Darnell, Rose M. Darnell, E. R. Sherwin, Ross Brown, Esther Clark, Joseph Danne, Edward B. Hoebing, Leonard Mueggenborg, E. C. Pazoureck and Frank H. Carpenter, Defendants in Error.

No. 38333.

Supreme Court of Oklahoma.

Dec. 1, 1959.

Rehearing Denied March 1, 1960.

As Amended Oct. 24, 1960.

Application for Leave to File Second Petition for Rehearing Denied Oct. 25, 1960.

Busby, Stanfield, Deaton & West, Ada, and Howell & Smith, V. E. Stinchcomb, and Granville Tomerlin, Oklahoma City, for plaintiffs in error.

Wesley A. Smith, Milton R. Moon, Oklahoma City, for defendant in error, M. L. McLain.

BLACKBIRD, Justice.

This appeal was perfected after entry of a judgment which, among other things, granted the defendant in error, M. L. McLain, a peremptory writ of mandamus against the plaintiffs in error, Panhandle Cooperative Royalty Company and its officers, Bill Darnell, V. E. Stinchcomb, W. D. Housh and Mrs. Blanch Blackwell, requiring them to permit the said McLain to examine, and take extracts from, the stockholders' records and stockholders' ledger of said Company.

The principal issue at the trial was whether the purpose, for which McLain and other original plaintiffs in the case, wanted to thus obtain stockholders' names and addresses, was a proper one.

Preliminary to determining whether the trial court's judgment is contrary to law and to the evidence in granting the writ and thus holding, in effect, that said purpose was a proper one, within the meaning of Tit. 18 O.S.1951 § 1.71, certain facts about Panhandle Cooperative Royalty Company and the activities of the various parties involved, should be stated.

The Company, which; when referred to by name herein will be called simply "Pan", was incorporated in 1926, with one Bill Darnell as its first, and, as yet, only president. According to the company's prospectus, its stock was to be issued in exchange for undeveloped royalty, or mineral rights; which could not be sold or exchanged (according to its by-laws) "without a majority vote of all the stockholders. * * *"; and the Company's income was to be derived from oil and gas lease bonuses, rentals, and "pipe line checks"; and then be divided pro rata among its stockholders. The prospectus further rep-

resented that according to Oklahoma laws governing co-operatives (under which the Company was organized) no one or group of stockholders could get control of the company by buying up its shares, for no one could own more than 10 shares and "every stockholder has only one vote regardless of the number of shares he owns."

Article IV, Section 1, of Pan's by-laws provides for annual meetings of the stockholders on July 1st of each year and also provides for the election of directors at such meetings "to serve until their successors shall be elected and qualified." Section 7 of the same Article provides that a quorum for the transaction of business at such meetings shall consist of "a number of members representing a majority of the shares of stock issued and outstanding;" and Section 8 of that Article authorizes the stockholders "by a majority vote at any such meeting" to remove any director or officer from office.

Pan's present Board of Directors consist of its three highest ranking officers, Darnell, V. E. Stinchcomb and W. D. Housh, together with one R. R. Sheets and Leon Olson. There has never been a declared quorum sufficient for the transaction of business at any annual stockholders' meeting for the past twenty-five years, and consequently all of the named men, except Darnell (who was one of the incorporators but for several years has been inactive because of poor health) have been elected members of the Board in the manner provided by Section 8, Art. IV of the Company's by-laws—that is, by the Board itself.

By the acquisition of one share of its stock, the defendant in error, M. L. McLain, became a Pan stockholder in 1944.

In a letter written on the "Statement Of Receipts & Disbursements" over the signature of V. E. Stinchcomb (who, since his election to the Company's Vice-Presidency in 1956, has been its chief managing officer) mailed to Pan's stockholders in August, 1956, it was stated that the Company then owned "32,000 full mineral acres" and that it had 1,465 shares of stock outstanding.

The Company's 1957 annual stockholders' letter did not mention how many shares of its stock were outstanding, but it contained statements to the effect that, because of title defects, litigation, and other circumstances, the Company had lost an unmentioned number of acres of the royalty previously deeded it for stock, and might lose an undetermined number more in the future. (It is indicated that when Pan lost royalty as a result of the defective title of its grantor, to whom it has issued stock in exchange for said royalty, that stock is then subject to cancellation). It appears that in September, 1957, according to said Company's Assistant Secretary-Treasurer, Mrs. Blanch Blackwell, its office was out of contact with "Three hundred and forty or fifty" of its stockholders; and it was not known whether or not they were dead or alive and whether or not the shares originally issued to them were still in existence or in such status as could be voted at a stockholders' meeting. The only stockholders present at the July 1st, 1957, meeting, besides the hereinbefore named directors, were McLain, a Mrs. Myrtle Oaks, who owns one share, and the Company's Assistant Secretary-Treasurer, Mrs. Blackwell, who acted as the secretary of such meetings. At said meeting, it was announced, by Mrs. Blackwell that Pan's income during 1956, had aggregated more than $79,000, that there were (still) 1,465 shares of stock in the company outstanding, that only "a fraction over" 540 of such shares were represented at the meeting (by proxy or otherwise), which said number, being less than a majority, and not a quorum, was insufficient for the transaction of any business (as had been the case at previously scheduled annual meetings).

Later the same month, McLain, using the maiden name of his wife, "C. V. Terry" wrote letters to persons in various parts of Oklahoma he thought might own shares of Pan's stock, trying to ascertain if they would be interested in selling such shares at a price of $25 each. About the same time, McLain employed one H. G. Starkey

to examine courthouse records in various counties of the State for the purpose of ascertaining the names and addresses of persons who had deeded royalty to Pan (and thus might own shares of its stock), and then to contact them and try to purchase their stock if any, for $50 per share. If such persons would not sell, Starkey was to attempt to get their signatures on proxies McLain had drafted authorizing him to represent them at the company's future stockholders' meetings. While McLain had Starkey engaged in traveling around the State searching out possible Pan stockholders, by using county records, his attorney, Wesley A. Smith made an oral request of V. E. Stinchcomb for permission to examine Pan's stockholders' records. Stinchcomb asked that such request be put in writing. Thereupon, this was done in a formal request or demand, dated September 11, 1957, drafted for signature by McLain and other stockholders, asking that McLain and "such auditors, attorneys, and stenographers as he might deem necessary to perform the work" be allowed to make the inspection and examination "at such reasonable times * * * as not to interfere unduly with the work of the Corporation employees", and stating the purpose of the request or demand in subparagraphs as follows:

"a. Undersigned shareholders desire to know what are the valid laws providing for internal management of the Corporation, their rights and obligations thereunder, and what steps are being taken by shareholders, officers and directors at duly constituted meetings for the welfare of all shareholders.

"b. It is understood that for the past several years quorums were not present at the Annual Shareholder's Meetings, and we desire to know what steps are being taken to remedy this situation. If steps are not being taken to remedy this situation, the cause thereof must be determined, examination must determine who are valid owners of shares in the Corporation,

their addresses searched out so that all shareholders may be circularized for the purpose of calling special meetings of the shareholders, at which time the internal affairs of the Corporation may be reviewed and a new Board of Directors be elected that will represent the will of the shareholders. Examination of records showing who are valid share-holders is necessary so that it may be determined what constitutes a quorum at a meeting, and who is entitled to be notified of shareholders meetings, and who is entitled to vote thereat.

"c. The undersigned desire to know the names and addresses of all holders of valid shares in this Corporation so that proxies may be sought for subsequent meetings of shareholders, thereby insuring quorums, and so that new management policies may be adopted by election of new members to the Board of Directors.

"d. The laws of the State of Oklahoma require that Annual Reports be sent to all shareholders giving Balance sheet and Profit and Loss for the year, and examination of such records is desired to determine compliance with this law. If such law is not being complied with, then it is necessary to examine books of account to determine location and value of all properties, thus learning value of all assets and value of each share of stock. The undersigned desire to know the value of their shares.

"e. Names and addresses of all officers and directors is desired so that all shareholders may know who are charged with responsibility of managing the affairs of the Corporation. Examination of By-Laws and Minutes of meetings will enable the undersigned, and all other shareholders, to know who are the duly constituted officers and directors of this Corporation."

This form was thereafter given to Starkey for contacting Pan stockholders and ob-

taining their signatures thereon. After nineteen such signatures had been procured on the instrument, usually referred to as "The Demand", attorney Smith inclosed it in his letter, dated the same day (September 11, 1957) to Mrs. Blackwell, at Pan's office.

At a special meeting of Pan's Board of Directors on September 19, 1957, the above quoted demand and letter were considered, and it was decided to have Mrs. Blackwell furnish Mr. McLain a copy of the Company's by-laws, and their amendments, but, with reference to the demand for a list of its stockholders and their addresses, the minutes of that meeting reflect that the purpose of said demand was questioned, and, among other things, these minutes stated:

"Upon discussion and consideration * * * it appeared that Mr. McLain and possibly others were desirous of obtaining * * * (such list) * * * for the purpose of attempting to take over the control of the company by arousing and inciting dissatisfaction among the stockholders to get their proxies and possibly to attempt to buy their stock at a price not adequate. The Directors were of the opinion that if Mr. McLain would appear at the meeting of the Board of Directors, the directors could determine from him the purpose and object of the demand, and at the same time information as to the status of the company which he was complaining could be given to him.

"Upon motion duly made, seconded and carried, the Vice president was directed to write a letter to Mr. McLain at his office, same to be delivered to him, asking him to attend the meeting of the Board at 3:00 P.M., on this 19th day of September, 1957."

Thereupon, Mr. Stinchcomb wrote and dispatched a letter (by an employee used as messenger) to McLain inviting him to attend the Board's meeting later the same day. Due to other business commitments, McLain's attorney, Smith, could not ac-

company him to the meeting on such short notice; and McLain did not attend. The next day McLain again wrote Pan's office asking permission to examine Pan's records as to "Trust Certificate" holders, if any, and to make extracts therefrom as he deemed necessary. In the letter, he stated, among other things, that this new request was supplemental to the previous one of September 11th, concerning stockholders' records; and further stated:

"* * * we as shareholders want and should know who is legally entitled to vote the outstanding shares of this company and who is not entitled to vote such shares, which would be very important at any future meeting of shareholders."

McLain received no answer to this letter for about two weeks. In the meantime, he, his attorney Smith, and Starkey were meeting Pan's stockholders at various places in the State, and obtaining their signatures as plaintiffs, on the petition for the writ that was filed in this case on his and their behalf. The filing of said petition to commence this action thereafter occurred on September 30th, 1957. It was not until sometime in October thereafter that McLain received from any spokesman for Pan's management any definite answer to the requests or demands made in the above described letters of September 11th and 20th. This answer was contained in a letter over Stinchcomb's signature (delivered that day) which stated, among other thngs, that since McLain did not appear before Pan's directors on the afternoon of September 19th to disclose more fully the purpose of the requests made of the company, they felt that he "undoubtedly has some purpose in view which" he "did not wish to divulge." Stinchcomb's letter inclosed a list of the company's officers and directors, and a copy of its by-laws; and stated that there was no objection to inspection of the company's records, but that *making a copy of its stockholders' list was objected to.* The letter also stated:

"Any communication you desire sent to the stockholders, either now or

before the next stockholders' meeting will be submitted to the stockholders at their respective addresses by the Company."

The Answer Pan thereafter filed to plaintiffs' petition alleged generally that it had refused McLain a copy of its stockholders' list because his true purposes (as distinguished from those he stated) in wanting such list were improper and made to aid him in purchasing Pan stock shares from uninformed farmers and heirs of deceased stockholders at less than their true value, and to enable him and his associates to control enough stockholders' votes to change the policies of the company, resulting in its detriment and embarrassment through litigation and otherwise, and detriment to the stockholders. Part of the Answer admitted, in substance, that the persons to whom some shares of stock were originally issued had died and others apparently had current addresses different from those shown on the company's records (without naming or enumerating them) so that the notices of annual stockholders' meetings, annual statements of the Company's receipts and disbursements, and dividend checks, mailed to them in the past, had not been delivered. It stated that when such checks had been returned, the money thereby represented was retained by the company in a special fund deposit for the credit of the stock certificates upon which the dividend was declared; and such funds were not included in the cash assets reported to the stockholders every year. It further alleged, that in some cases, the amount of money retained in this special account and credited to such shares of stock amounted to as much as $80 per share; that the plaintiff, McLain, knew such accumulations were in existence, and also knew, after the statement of the Company's 1956 income and disbursements was announced at the July 1, 1957, meeting, that it had a large enough cash balance on hand to pay dividends of $40 per share to all stockholders; that one of McLain's purposes in requesting the stockholders' list was to acquire such shares, on which there

were accrued dividends, at less than their actual value and less than the dividends accrued on it, so that no actual cash outlay would be necessary and he would make an immediate profit by buying the shares before the owners thereof became aware of the dividends accrued thereon.

Other more detailed allegations of Pan's Answer, which was adopted by the other defendants, will hereinafter be referred to where necessary.

Evidence introduced at the trial tended to show, in addition to the undisputed facts hereinbefore related, that McLain's first difficulty with Pan's management arose in the Spring of 1957, when he purchased from one John J. Fox, Jr., a share of Pan's stock (perhaps the same as later referred to as the "Cox" stock), and, in his own words "had trouble getting" it transferred to him on the Company's records. He testified, in substance, that he argued with Pan's officials for three months before the certificate for said stock was finally issued to him. He readily admitted he had then begun trying to buy what he termed "a limited number" of shares in the Company, but denied that then (before issuance of the report at the July 1, 1957, annual meeting showing that the company had much the largest cash balance it had ever had on hand) or later, when he started sending out inquiries in his wife's maiden name of "C. V. Terry" for shares to buy at $25 each, he had any reliable information as to the assets of the company and value of the stock at that time. He testified, in substance, that it was because of Mrs. Blackwell's not wanting to transfer the "Cox" stock to him that he was trying to keep these purchase solicitations "confidential" by signing said letters: "C. V. Terry."

The minutes of Pan's directors' meeting of September 19, 1957, and other evidence, indicate that Pan management has refused to recognize McLain's ownership of two other shares of stock evidenced by purported assignments of the "Minnie E. Reick" and "Elbert H. Crawford" certificates. We deem it unnecessary to lengthen this opinion by relating the details of the disagree-

ment about these, but have thoroughly considered them and their relation to the issues involved.

In his testimony, McLain affirmed, in general effect, that his purpose in requesting permission to copy extracts from Pan's stockholders' list were those stated in the hereinbefore quoted written Demand. In effect he denied that it was his intention to use such information for finding gullible stockholders, or their successors or assigns, from whom he could purchase stock at less than its true value; and represented his purposes in causing the Demand to be circulated, signed and presented, to be that of ascertaining how many valid shares of the stock in the Company were outstanding, and how many of them were in such status as could be voted; what was the value of the individual shares; and to attempt to have a majority of the stockholders present at future stockholders' meetings, to the end that such stockholders would have a voice in determining the Company's policies in the transaction of its business.

Furnishing some basis in fact for some of the allegations of defendants' Answer, it was established at the trial that McLain was an officer in two petroleum companies and another royalty pooling company that operates similarly to Pan, but it was never shown that either of these compete with Pan, and there was no direct evidence indicating that one of McLain's purposes in wanting extracts from Pan's stockholders' records was to use them to further these companies' interests to the injury or detriment of Pan.

Among many other facts disclosed at the trial, it was shown that during his employment by McLain (in addition to the already mentioned Elbert H. Crawford share of stock he delivered to McLain) Starkey had purchased for $50 each, from their widows, four other stock certificates originally issued to one A. F. Dill, W. M. Robinson, John W. Ballantyne and Robert E. Smith. The evidence tended to show that the assignments of all of these shares were executed by the widows signing their dead husbands' names to them. The names

of Starkey, his wife, and his daughter were typed into three of these assignments as the assignee, and the other assignment was made to a Stillwater couple, who Starkey testified had requested him to purchase it for them. Starkey testified that he got his leads to the ownership of all of these shares from county records he examined. Starkey also testified that he is still working for McLain and trying to buy other outstanding shares in the Company.

There was testimony from a stockholder named Frank Carpenter that after he had received McLain's offer to purchase his stock at $50 per share, he received one from one J. E. Burrow to buy it at $100 per share, but that he rejected both of these offers and made a counter proposal to sell it for $250 per share, but this was rejected.

There was also testimony tending to show that in contacts with other stockholders to procure proxies and obtain signatures on plaintiffs' petition herein, McLain —or Starkey for him—had told some of those stockholders that Pan's management had refused access to Pan's stockholders' records; and one, or more witnesses, was allowed to give testimony contemplated to show that McLain's and Starkey's activities had created confusion and dissatisfaction among the stockholders.

Defendants offered to prove by Director W. D. Housh and Mrs. Blackwell that if McLain, or any of the other plaintiffs, was ever successful in obtaining by vote of the stockholders, "or otherwise", a change in the policy of the Company, as announced in its prospectus, of paying its surplus income out in dividends, rather than buying more royalty with it (as McLain had suggested at the July 1, 1957, stockholders' meeting), they, or each of them, would institute litigation to prevent that.

Before the close of the trial, plaintiffs' attorney agreed with Robert E. Smith's widow and John W. Ballantyne's widow's companion, a Mrs. Jump, that Starkey would return to both widows the stock certificates he had purchased from them

(and which had not yet been transferred on the records of the Company) if the consideration he had paid for them was returned to him.

There was a great volume of evidence, other than mentioned above, that was introduced at the trial and incorporated in the 899-page casemade. Though we have carefully examined it all, some of it has little or no bearing on the issues argued in the briefs; and it is neither practical nor necessary to attempt a full description or delineation of it herein.

■ Under the first proposition they urge for reversal, defendants contend that the purpose referred to in sub-paragraph "d", supra, of the above-quoted Demand was based upon the "misapprehension" that Pan was organized and existing under the "General Business Corporation Act" (Tit. 18, Chap. 10, O.S.A.) and therefore their complaint that no balance sheet was sent to Pan's stockholders as required under Section 1.72, subd. b of the General Act was without foundation. We think the evidence, as a whole, amply supports McLain's position that the information the Company's management had furnished the stockholders was not sufficient to enable them to know the value of the Company's assets or its stock. We do not see how defendants can seriously contend that Pan's annual "Statements Of Receipts & Disbursements" showed the "financial condition" of the Company "* * * in such form as shall fully exhibit (its) assets and liabilities * * *" as required by Tit. 18 O.S.1951 § 434, whose applicability is apparently agreed. These statements show no entry identifiable as "assets" or "liabilities". Among other things, they do not reveal whether the above-mentioned undisclosed amount of money retained and set aside by the company to pay declared, but undelivered, dividends, is carried on the Company's books as an asset or a liability.

Neither do they reflect the earning of any interest or income on the substantial amount that they have designated as: "Cash in Bank * * *". Nor do they disclose the value of the Company's mining properties (or those that have been "charged off" as the accountant, Peters, expressed it—because of defective titles), which undoubtedly comprises the bulk of its assets, and which the defendants' witness, W. D. McBee, testified were worth $434,980, which total he stated was the equivalent of $296.85 for each share of the Company's outstanding stock. (Defendant's witness, Mrs. Blackwell, testified that Pan's mineral properties had never been appraised, as it was "thought" that such an appraisal would be too expensive). It is apparent that this computation does not employ the figure "1465" that, for several years, has been represented by the Company's management as the number of stock shares it has outstanding, and, on the basis of which, quorums for annual stockholders' meetings have been arrived at. In his testimony, McLain called attention to the questionability of this figure when he stated, in substance, that the Company management has, for several years, continued to use it for fixing quorums for stockholders' meetings, despite the fact that, during said period, various stock certificates had been cancelled, or had been refused recognition as evidence of stock ownership. Nor does the testimony of the Company's Assistant Secretary-Treasurer, Mrs. Blackwell, who testified that she is in charge of Pan's office, dispel the doubt as to whether anyone knows just how many valid shares of the company stock are outstanding or how many persons have them, or can vote them, or what percentage of such persons have ever received notice of recent stockholders' meetings. In her testimony, Mrs. Blackwell, explained the steps the company management had taken in its efforts to locate persons who held outstanding shares of its stock and who were entitled to unpaid dividends thereon, but she admitted, and the evidence strongly indicates, that these efforts have not been successful. (Mrs. Blackwell also disclosed that beginning in 1948, the Company had abandoned its previous method of mailing notices of

annual stockholders' meetings that assured the Pan office of all undeliverable notices being returned to it. As to that abandoned method, Mrs. Blackwell testified it was the way the Company previously obtained the addresses of "a lot of" its stockholders). Without such essential information, neither the exact value of the individual shares, nor the number necessary to be represented for a stockholders' meeting quorum can ever have been accurately or definitely determined. As the evidence is convincing that the company management has not exerted effective, or exhaustive, efforts to obtain this information, we think that constituted one valid ground, at least, for a demand for such data from stockholders' records as would assist in obtaining it.

Defendants concede that it is only by basing an inference upon an inference that it might be concluded that McLain's purpose in obtaining the information he sought from Pan's office, was to "obtain enough proxies to take over the company and its management himself." Since they do not contend that if his purpose was to bring about the election of a new board of directors, or win control of the company, such purposes would be improper ones (notice E. L. Bruce Co. v. State, ex rel. Gilbert, Del., 144 A.2d 533; Doggett v. North American Life Ins. Co., 396 Ill. 354, 71 N.E.2d 686; Bundy v. Robbins & Myers, Ohio App., 75 N.E.2d 717) we need not consider the sufficiency of the evidence to show that such were McLain's true purposes.

 They do say, however, that, disregarding evidence erroneously excluded, the record is "replete with affirmative evidence * * * showing McLain's speculative, vexatious, ruinous design and motives." In defendants' argument, the only purposes they claim to be affirmatively shown for McLain's wanting to inspect and copy the stockholders' records was "to inveigle" from unsuspecting stockholders "their shares at much less than * * * (their) * * * value and to confuse and deceive them regarding * * * (their)

* * * value and the operations of the Company." They charge that McLain's use, for this purpose, of a certain Oklahoma map purporting to indicate the location of Pan's mineral rights in this State, was reason enough, under Tit. 18 O.S.1951 § 1.71, subd. d for refusing his Demand. That section, among other things, makes it a defense (among others available) to "any corporation or officer or agent thereof" in any action for the penalty therein prescribed for their refusal "to permit any books and records to be inspected, or extracts taken or abstracts made therefrom * * *, that the person suing therefor has, within two years (2) * * * improperly used any information secured through any prior examination of the books and records of such corporation * * *". It is doubtful whether the information appearing on this map, which the evidence shows McLain procured from one of Pan's stockholders named Martin, of Bridgeport, Oklahoma, is such information as is contemplated in the quoted statute; but, be that as it may, the question still remains: Was the ultimate purposes for which this map was used—which were no different from McLain's purposes in contacting, or causing to be contacted, certain ones of Pan's stockholders, an improper one?

In determining this question, we recognize, as pointed out in Bresnick v. Saypol, Sup., 57 N.Y.S.2d 904, mod., 270 App.Div. 837, 61 N.Y.S.2d 376, cited by defendants, that one danger in the disclosure of stockholders' lists is that it may "furnish unscrupulous speculators" with information that may be used to procure stock at values well below their intrinsic worth; and we assume, without deciding (as some courts have) that if such use is the purpose of a demand for such a list, it is an improper one. However, our examination of the entire record herein does not convince us that the trial court's judgment to the effect that such was not McLain's purpose, is clearly against the weight of the evidence. We say this even though there is evidence tending to show that he may have

obtained the assignments of a few shares of Pan's stock for less than their true value. We do not think that the evidence tending to show the latter, coupled with other evidence, including that with reference to statements he is said to have made at the July 1, 1957, meeting indicating his idea, or desire, that Pan should use its cash on hand to buy royalty that could probably be obtained from widows and orphans at advantageous prices (as he claimed to have done) establishes that his real purpose, in wanting to make a transcript of, or take extracts from, Pan's stockholders' lists, was to enable him to take advantage of gullible stockholders. It was not shown that, at the time he purchased either of the stock certificates acquired after that meeting, Pan had ever appraised its properties as a whole, or had issued to its stockholders any estimate of their value. Nor was it shown that the surplus cash it had on hand on the date of that meeting was sufficient to pay dividend of as much as the $50,—the price which seems to have been paid for each of those shares. McLain testified that at said meeting Mrs. Blackwell announced that (of the $80,059.33 shown on the stockholders' Statement of Receipts & Disbursements, dated August 2, 1957, to have been Pan's income during the year 1956) the Company had "the sum of $55,000.00, in cash, on hand, at that time." When we consider the grounds upon which defendants purported to refuse McLain's Demand, we are reminded of the following words of the court in Knox v. Coburn, 117 Me. 409, 104 A. 789, 790:

"In his testimony Mr. Coburn expresses concern that if the writ were granted annoyance to the stockholders might result. It is difficult to see how such a result would follow. The creation of a wider market for the stock cannot certainly be detrimental to the stockholders' interest, and any information as to stock being offered for sale, or of opportunity to sell stock to persons desiring to purchase, would naturally be to the stockholders' interest. The corporation has within its power to very effectually guard the stockholders against any deception, if such should be attempted, by distributing to its stockholders printed statements of its financial condition in such form as to afford full information. It seems that in the case of this particular corporation it has not been the practice so to do."

Nor do we think that defendants' belated offer to allow McLain to inspect Pan's stockholders' list, or records, and to mail to them any communication he desired to convey to the stockholders, was a defense to them, under the particular circumstances of this case. Nor do we think the fact that McLain—even since Pan's offer to allow him to do so—has never attempted to inspect its stockholders' records necessarily shows, as defendants contend, that Demand was not made in good faith. If he was entitled to inspect these records, we think that, under the circumstances, he was also entitled, in a proper manner, to also make abstracts from them. Our statute, sec. 1.71, subd. d, supra, specifically contemplates corporations' permitting "extracts * * * or abstracts" to be made from "any books and records to be inspected * * *"; and there is good reason for this. With reference to a stockholder's right to take extracts from such records, the court, in State ex. rel. Watkins v. Cassell, Mo.App., 294 S.W.2d 647, 653, said:

"To deny a stockholder such right virtually amounts to a denial of the right to inspect."

The court thereafter quoted from a New York case as follows:

"The right of inspection thus given is to inform the shareholder of the facts appearing in the book, so that he may act thereon. He is entitled to all of the information disclosed by the book. It is not to be presumed that he can carry in his memory all of its contents, and, as the inspection is granted for the purpose of informing him concerning the matter, he has the

right to make such copies and memoranda as will make the inspection effectual not only by conveying to his mind the contents of the book, but also by enabling him to retain the same in such form that he may act thereon for any legitimate purpose. The right of inspection, therefore, carries with it the right to make such extracts from the book as will enable the shareholders to retain the information disclosed by the inspector."

The courts will welcome "any instrumentality not harmful to a corporation's interest, which will implement a proper objective and * * * will induce as widespread a certificate holder response as possible * * *" (Bresnick v. Saypol, supra) [57 N.Y.S.2d 910], and we think that statement should be particularly applicable to a company like Pan, where, for so many years, so many stockholders have apparently had no interest, or voice, in its affairs. The evidence here indicates that if the Demand made upon the defendants has had no other effect, it has aroused such an interest, and brought to certain stockholders' attention information of which they were unaware, or about which they had taken no effective action. In fact, in at least one instance—that of Frank Carpenter—it may be inferred that the project begun by McLain was instrumental in the placing of a substantially higher value on Pan stock than the price for which any of it had ever sold.

In accord with the foregoing, we have concluded that the trial court's judgment in granting the writ was neither clearly against the weight of the evidence, nor contrary to law. Said judgment is therefore affirmed.

DAVISON, C. J., WILLIAMS, V. C. J., and HALLEY, IRWIN and BERRY, JJ., concur.

WELCH, JOHNSON and JACKSON, JJ., dissent.

WELCH, J. (dissenting.)

I think the majority opinion confuses the right of a shareholder to examine corporate books to protect his own interests with the right here claimed by McLain to obtain a list of all other shareholders and addresses.

He definitely seeks this list for use for his own personal interests. Such a list in this or another corporation could be so used for many personal purposes far too numerous to mention.

Without permission of the stockholders I have grave doubt that such a list should be furnished to a stockholder any more than to a nonstockholder who wanted it for personal interest use.

There has been no refusal to permit full examination of other books and records of this corporation and the making of notes or abstracts therefrom. The only thing here involved is the furnishing of a list of stockholders with addresses. There has been no mismanagement of corporate affairs.

In approaching the question as to McLain's equitable rights consideration should be given to the company with which we are dealing, the purposes for which it was organized, the stockholders who own it, the difficulties in inducing them to attend stockholders' meetings, also the nature of the properties owned and the directors reports to the stockholders. The latter paid but little attention to the affairs of the company until the year 1956 when it came into considerable money.

Consideration should also be given to McLain as a stockholder. He had little invested. After the stock appeared to be valuable he attempted to deal sharply with the other stockholders and their heirs. He attempted to acquire more stock for much less than its actual value and through agents made improper statements to his costockholders. His actions caused much confusion among the stockholders who questioned his motives.

Consideration should further be given to the fact that McLain's activities were

brought to the attention of the board. The board then requested McLain to attend a board meeting to discuss his purpose in demanding the stockholders list and addresses. A time was set for the meeting for McLain's convenience, but he refused to meet with the board or to aid it in resolving the question of whether it should ignore his past actions and furnish him the list of stockholders and addresses. The board did not rely upon its own judgment as to McLain's demands, but requested advice from their attorney. I find no criticism for the board for their so-called "belated offer" to allow McLain to examine the stockholders list and other records by reason of waiting for advice from their counsel.

It is important to note that McLain and his counsel in their testimony did not deny the implication and charges of McLain's sharp dealings with the stockholders.

No presumption of good faith can be attributed to McLain's demands for the names and addresses of the stockholders when he refused to meet with the board of directors personally so that the board might ascertain his intentions and determine what was proper for it to do.

The good faith of the board was spelled out in a long letter written to McLain after his demand. This letter was dated September 30, 1957, and its substance is a refutation of any bad faith on the part of the board. In it McLain was advised that after his demand for the stockholders list with their addresses, the directors had a special meeting to consider it. Also, that the board had been informed as to McLain's activities in attempting to purchase stock in the company; also that McLain's activities included the soliciting of proxies in an effort to obtain control of the company to the end that accumulated funds could be used for acquiring other properties instead of the paying of dividends as required by the by-laws. The board recounted that when invited McLain first agreed to appear at the special meeting of the board, but later refused to appear. The board recited that there was no objection to McLain's inspection of the minute and other books and records, and of the stockholders list, which list had been at all the stockholders meetings and was subject to the inspection of all; the board also advised McLain he could inspect the list of properties owned by the company. The letter reiterated that neither McLain nor any other stockholder had ever been refused the right to inspect the books and records. But the board refused to permit McLain a copy of the stockholders list with addresses, but it did agree to mail any communication which McLain desired to send to the stockholders.

This letter is evidence of the best of faith on the part of the directors and McLain's refusal to act under the terms of it is at least some indication of bad faith on his part.

In view of the board's offer there was only one legal question before the trial court. This was whether one stockholder can make a demand for a list of the names and addresses of the stockholders and be entitled to receive this, ipso facto, and simply because he had made the demand. Since McLain could inspect the list of stockholders but not make a copy thereof the officials rightly took the position that he wanted such list for an improper purpose and not for the best interests of the company.

The trial court found in this case that there was no mismanagement of the company on the part of the officers and directors, and all of the attorneys in the case stated to the trial judge that mismanagement was not an issue in the case.

Actually the trial court permitted substantial evidence charging McLain with being a sharp dealer and seeking the stockholders list for an improper purpose. But, when McLain charged the officers of the company with purported derelictions of duty to the stockholders and then by his objections prevented evidence refuting these charges, he narrowed the case down to this one point: If one stockholder demands that he be furnished a copy of the names and addresses of his co-stockholders, was

he entitled to this, ipso facto, as his legal right? Under this fact situation, I do not hold this to be the law in Oklahoma.

There are amicus curiae briefs filed herein by attorneys representing REA groups and others, and as pointed out by them the cooperative officials guard their stockholders lists from the general public until certain presumptions of law and fact are overcome. Otherwise, any stockholder of a cooperative could demand a list of the names and addresses of his co-stockholders and furnish the same to commercial houses, or candidates for office, or for some improper purpose that would constitute a nuisance to the cooperative. Solicitors could also become a nuisance to the stockholders whose names had been furnished.

The Oklahoma statute here involved is Title 18 O.S.A. § 1.71(e), page 461, which provides that "upon proof by a shareholder, or other person possessing such right, of proper purpose," a court in Oklahoma may compel by mandamus, the production for examination by the shareholder of the books and records of a corporation.

The decisions of all courts on this question of demand hold that if the demand has been made, and a reply is filed by the corporation asserting the demand is for the purpose of defrauding other stockholders, and not for a proper purpose, the burden then shifts to the plaintiff to show that his purpose is a proper one. Hecht v. Select Theatres Corp., Sup., 91 N.Y.S.2d 464; State ex rel. Miller v. Loft, Inc., 4 W.W.Harr. 538, 34 Del. 538, 156 A. 170; Sawers v. American Phenolic Corp., 404 Ill. 440, 89 N.E.2d 374, 15 A.L.R.2d 1; State ex rel. Cochran v. Penn Beaver Oil Co., 4 W.W.Harr. 81, 34 Del. 81, 143 A. 257; Bresnick v. Saypol, 269 App.Div. 915, 57 N.Y.S.2d 504; Capron v. Pacific Southwest Discount Corp., 6 Cal.App.2d 436, 44 P.2d 629; Doggett v. North American Life Ins. Co., 396 Ill. 354, 71 N.E.2d 686; People ex rel. v. Produce Exchange Trust Co., 65 N.Y.S. 926; Holdsworth v. Goodall-Sanford, Inc., Me., 55 A. 2d 130, 174 A.L.R. 257; Morris v. Broadview, Inc., 385 Ill. 228, 52 N.E.2d 769; Re

De Vengoechea, 86 N.J.Law 35, 91 A. 314; Vernam v. Scott, 12 N.J.Misc. 177, 171 A. 171; Excise Board of Tulsa Co. v. City of Tulsa, 180 Okl. 248, 68 P.2d 823; 13 Am. Jur. Sec. 446, p. 493; Guthrie v. Harkness, 199 U.S. 148, 26 S.Ct. 4, 50 L.Ed. 130; Bruning v. Hoboken Ptg. & Pub. Co., 67 N.J.Law 119, 50 A. 906; 18 C.J.S. Corporations § 510, p. 1187; Guaranty Old Line Life Co. v. McCallum, Tex.Civ.App., 97 S.W.2d 966.

Sawers v. American Phenolic Corporation, 404 Ill. 440, 89 N.E.2d 374, 15 A.L.R. 2d 1, is the parent case on the question involved here. The facts are on all fours. There the petitioner was an investment broker and owner of stock in the defendant corporation, and he sought a writ of mandamus to enable him to copy the list of stockholders. The petitioner alleged and stated in his evidence, when asked as to his purpose for copying the stock list, that he wanted "to communicate on the earnings and the royalties: with the stockholders and "that the amount of the royalty payments was too high." "He further admitted that he might want to offer himself as a director· but this was not his intention at the time of the request." "He merely wanted to examine the books to determine whether or not further action was necessary and wished the stock list for that purpose." "He admitted also that the Company had opened the books and records and the stock lists to his inspection, but refused to let him copy the list of the stockholders." "The Company, in addition to opening its books and records to the petitioner herein, has offered to mail all material or any communications from the petitioner to the stockholders at petitioner's expense, but the petitioner has not availed himself of this privilege."

In the case at bar, when McLain was asked by his counsel to tell the court why he wanted to examine the shareholders' record and take extracts therefrom, his answer was:

"There is possibly several reasons, but the principal reason is to determine who the

legal stockholders' are; the present management of the Company and who the shareholders are and certain shares they might acknowledge; and also to obtain a list of the shareholders and addresses so that we can check these stockholders out; attempt to have them present, either in person or by proxy; so that the shareholders will be legally represented and have a say so as to who the directors are and see how the management policies should be formed; in other words, check out the facts and give them to the stockholders." (C.M. 235–236)

The reasons given by McLain parallel the reasons given by the petitioner in the Sawers case, supra. Further, the opinion in that case states that Sawers bought his stock in 1947 and in March, 1948, made his request for the stockholders list; that he never entered into any discussions with the officers of the company, never asked any one about the company, and never attended stockholders' meetings. The record here shows, without dispute, that McLain became a stockholder in 1944; that he attended only two stockholders' meetings, in 1954 and 1957; that he never entered into any discussions with the officers of the company, and never asked any officer or director about any matters concerning the company.

The Illinois Supreme Court, on the facts laid before it in the Sawers case, laid down the criteria by which a court could determine the honest intent and good faith of a stockholder asking for a list of the stockholders and their addresses, as follows:

"To maintain the proper purpose required by statute some effort should be made by the shareholder to determine the condition of corporate affairs of the corporation in which he is interested. This effort could be shown by attendance at stockholders' meetings, examination of the books and records of the corporation and from evidence of effort on the part of the shareholder to determine the financial situation and the character of management of the corporation in question These requirements would seem to be inherent in the term 'proper purpose. * * *' (At page 379 of 89 N.E.2d, Syllabus 5, at page 9 of 15 A.L.R.2d)·

"In this cause the shareholder has not availed himself of the opportunity to ascertain any facts concerning the management of the business. Had the purpose of the petitioner here been merely the communication with other stockholders in the corporation, he could have availed himself of the offer of the corporation to mail any information to the stockholders which petitioner desired. His actions here are not indicative of sufficient interest to satisfy the meaning of proper purpose." At page 380 of 89 N.E.2d, at page 11 of 15 A.L.R.2d.

The Oklahoma statute was taken from the statutes of the State of Illinois, S.H.A. ch. 32, Sec. 157.45. (See our statutes, Title 18, Sec. 1.71, subsection (e) foot note.) But our statute omits the words "record of shareholders" which appear in the Illinois statute. The majority opinion does not mention or refer to the history of this statute.

In determining the meaning of a statute of this State, adopted from another State, the decisions of that state will be accorded some recognition even if not followed by this court. In the majority opinion the Sawers case is not mentioned or discussed.

Here no official was accused by McLain of mishandling one dollar of funds, or of any official wrongdoing in any manner. If such charge were made this would go legally to the internal affairs of the company and McLain's suit should have been in equity and specifically for this purpose. A mandamus action does not lie to change the internal management of a corporation.

In Rock Creek Oil Company v. Moore, Tex.Civ.App., 41 S.W.2d 501, 503, the court there held:

"Mandamus is not a writ of right. It issues to remedy a wrong, not to promote one, and will not be granted in aid of those who do not come into court with clean hands." United States ex rel. Turner v. Fisher, 222 U.S. 204, 32 S.Ct. 37, 56 L.Ed. 165.

The court in Davids v. Sillcox, 1946, 188 Misc. 45, 66 N.Y.S.2d 508, 514, said:

"The blackmailer, the scandalmonger, the irresponsible busybody and troublemaker, the professed seeker of information which is really intended to be used for some ulterior purpose, will be given no consideration by the court."

Knox v. Coburn, 117 Me. 409, 104 A. 789, and State ex rel. Watkins v. Cassell, Mo. App., 294 S.W. 647, both cited by the majority opinion do not apply to the fact situation involved here. In those two cases there was not involved the charges against the plaintiff as were made here, to-wit: That he is a sharp trader and that he desired the list to serve his own personal interests and possibly to take advantage of his co-stockholders. The proof shows that McLain did obtain some of the shares of stock from widows of shareholders for $25.00 and $50.00, whereas the true value of the stock was much more than that amount. The majority opinion emphasizes the fact that McLain's attorneys offered in court to have him return some of the stock certificates and take his money back. But the record evidence shows the company was merely trying to protect the stockholders and the corporation and that McLain's purpose in demanding the stockholders list was not a proper purpose.

McLain complained that he had trouble getting his stock purchases transferred on the company books. As soon as the officials, however, ascertained that the assignments of this stock were proper, transfers were properly made on the books.

### Summary

In arriving at a proper conclusion in this case we have the following basic facts:

1. The Panhandle company from 1926 to 1956 had only sufficient income to pay annual expenses and in some years small dividends.

2. The company offered McLain an open inspection of its books—and he actually had them audited—and all the records, including the right to scan the stockholders list; the only thing ever denied him was to be furnished a list of the stockholders' names and addresses; the company offered to send any letter or communication that McLain desired to the stockholders when he so requested.

3. At the July, 1957, stockholders meeting McLain insisted that the approximate $79,000.00 cash on hand be not paid out as dividends but that it be used for purchasing additional mineral rights without submission for a vote of the stockholders. He stated that by watching death lists and contacting widows and orphans he had found they were always ready and willing to sell their properties cheap. Also, that even if the majority of the stockholders were farmers, and that, under the by-laws no additional interests could be purchased without submitting this to the stockholders, he, McLain, thought they should be ignored.

4. McLain sent letters in his wife's maiden name to a number of stockholders whose names he had obtained from the county clerk's records, offering $25.00 per share for stock. At that time he knew there was some $79,000.00 in cash, or approximately $50.00 per share of the stock outstanding. This offer of only a fraction of the actual value of the stock, which value he knew—was fraudulent on its face. McLain also hired one Starkey for $25.00 per day plus expenses to contact as many stockholders as he could to try to buy their stock, and if he could not to get their proxies. He erroneously informed Starkey the company would not let him see the company books and records; Starkey swore he contacted at least 300 stockholders whom he told the company would not let McLain, a stockholder, see its books and records, that he contacted two elderly ladies, widows of deceased stockholders, that he bought one share of stock from each, telling them they had the right to sign their deceased husbands' names to the stock certificates to transfer the stock, that some of these certificates of stock he purchased were transferred to him or to his wife or son, others to McLain's daughter and a clerk in his office. At the time McLain and Starkey

were contacting stockholders and prior thereto McLain had not requested or demanded to see or go over the company books and records; yet the stockholders were advised by them that Panhandle's officials had refused McLain the right of inspection of the books. This inaccurate statement wrongfully maligned the officers and directors of the company.

5. The majority opinion ignores or overlooks the fact that after McLain made his demand for the stockholders list, the company's officers on September 19, 1957, per the letter mentioned above, agreed that he could have unlimited access to the books and records of the company. It was only because of McLain's prior activities set forth above that he was denied his request for the stockholders list, and to copy it.

The majority entirely disregards as unimportant the evidence as McLain's actions prior to making his demand and the filing of this suit. Further, it ignores the permission granted McLain to inspect and examine all the books and records. It discredits any evidence set up by Panhandle showing it had acted solely to try to prevent the stockholders from selling their stock for the woefully inadequate amount offered by McLain for their stock. It refers to a lack of a quorum at stockholders' meetings, and ignores the fact that the election of officers by the board of directors was legal and at all times as provided by the by-laws of the company. It overlooks the evidence that year after year the company records showed the outstanding stock stood at approximately 1,465 shares and that this was brought to the attention of the stockholders. It emphasizes the number of stockholders that had died or could not be reached through their post office addresses on the records, but fails to mention the active efforts made annually by the company to locate missing stockholders.

The majority opinion directs its comments and findings to the alleged shortcomings of the internal management of the company despite the fact that the trial court found—and all attorneys in the case stated to the trial judge—that there was no mismanagement and such was not an issue in the case. Thus, the majority opinion is not based on the same theory on which the trial court reached its conclusion. If in the opinion of this court this case is to be decided on the question of whether or not there was mismanagement, we should have simply reversed the case and sent it back to the trial court with instructions to determine whether there was sufficient mismanagement to entitle McLain to the relief sued for.

The majority opinion voices some criticism of the Panhandle officers for not having its properties appraised nor advising the stockholders of the value of the stock. The officials contend, and I believe correctly from the evidence, that this criticism is not just; and does not rise to such importance that McLain should be furnished the stockholders list to correct this. Actually McBee's evidence in the case shows appraisal at $434,980.00, or $269.00 per share.

The net effect of the majority opinion is that McLain should be given the list of the stockholders and their addresses so that he could contact them to correct some of the alleged insignificant acts of the officials and revise the internal management of the company. To hold thus would be authorizing that to be done indirectly which cannot be done directly; that is, permit by legal fiat, in a mandamus action, the changing of the internal management of a corporation by the courts.

If there had been any internal mismanagement—and all parties agree that there was none—the proper remedy would have been a suit in equity to oust the officers.

Mandamus is not a writ of right. It issues to remedy a wrong, not to promote one, and will not be granted in aid of those who do not come into court with clean hands. United States ex rel. Turner v. Fisher, 222 U.S. 204, 32 S.Ct. 37, 56 L.Ed. 165. Guaranty Old Line Life Ins. Co. v. McCallum, supra. State ex rel. Paschall v. Scott, 41 Wash.2d 71, 247 P.2d 543; Re De Ven-

goechea, 86 N.J.Law 35, 91 A. 314, supra. Verman v. Scott, 12 N.J.Misc. 177, 171 A. 171, supra. Excise Board of Tulsa County v. City of Tulsa, 180 Okl. 248, supra. 18 C.J.S. Corporations § 510, p. 1187.

McLain's law suit from a legal standpoint actually is predicated solely on the following points:

1. That for twenty-five years there has not been a quorum present at any annual stockholders' meeting.

The answer to this is: The record shows that it has not been the fault of the management by the present officers of the company that there has been no quorum—rather it is a lack of interest on the part of the stockholders to appear after an annual meeting was properly called. The officers of the Company have properly notified all of the stockholders of each annual meeting and most of them have failed to appear at the meetings. On this point there is no basis for a writ of mandamus to issue in behalf of McLain.

2. That five members of the present board of Directors were not elected by shareholders.

The record shows that the board of directors was properly elected in the first place as required by the statute and the by-laws; that when a vacancy has occurred on the board, and a quorum was not present at a stockholders' meeting, the vacancies were filled by the remaining directors as provided by the statute and the by-laws. On this point McLain has no legal grounds for a writ of mandamus.

3. That the officers have sent proper notices to all the shareholders of the annual meetings but for some reason the shareholders have not come forth with sufficient proxies to have a quorum present at the stockholders' meetings.

Certainly this does not constitute legal grounds for McLain to have a writ of mandamus.

If McLain relied upon internal mismanagement, then his remedy was in a suit to oust the officials, but instead he filed a mandamus action to obtain a list of the stockholders' names and addresses.

In conclusion, the majority opinion in this case should not stand as the law in Oklahoma, because it is subject to being misinterpreted by the bench and the bar. The law in this case should be that expressed by the Supreme Court of Illinois in Sawers v. American Phenolic Corp., supra, as that case interpreted a similar statute. Under the fact situation as set out in the majority opinion, the bench and the bar in the future might take the position that the demand of a stockholder for a list of his co-stockholders should be granted, ipso facto, regardless of the facts involved.

Actually, in a suit where a demand is made for such a list, and an answer is filed by the defendant corporation, asserting that the list is requested for fraudulent purposes and the demand is not made for a proper purpose, the issues are clearly drawn in the trial court. The burden of proof should then be upon the plaintiff to show that his demand is for a proper purpose, and if the fact situation develops that the true reason of the plaintiff is to obtain the list for his own selfish purposes, the Oklahoma court should follow the Illinois court and the almost universal ruling of every court that has passed directly on this question, and should deny the writ.

Such a clarification of the Oklahoma law should be announced herein so that there can be no misinterpretation of the majority opinion, and the bench and bar of Oklahoma may not be misled in the future. If the majority opinion stands as the law and without clarification, the cooperative corporations of Oklahoma might be subjected to manifest injustices. So will other corporations seeking to guard the confidence of their stockholders' list and to protect their stockholders from harassment by unrestricted demands and to prevent use of the stockholders' list for personal private purposes.

I respectfully dissent.